**In re HOFFINGER INDUSTRIES, INC., Debtor.**

**No. 2:01–BK–20514.**

United States Bankruptcy Court,
E.D. Arkansas,
Helena Division.

Feb. 24, 2005.

---

500

Stan Smith, Charles T. Coleman, Little Rock, AR, for Hoffinger Industries, Inc.

James Smith, Susan Gunter, Little Rock, AR, Whitney Davis, for Leesa Bunch and McGasker Enterprises, Inc.

Ben Arnold, Little Rock, AR, for North American Pool Co. and Cornelius Pools.

Stephen Gershner, Little Rock, AR, for J.M. Capital Finance, Ltd., Arrowhead Insurance Co. and related parties.

James Dowden, Little Rock, AR, for Unsecured Creditors Committee.

Charles Tucker, Little Rock, AR, Assistant U.S. Trustee.

Richard Crockett, for Aurea, Inc.

Geoffrey Treece, Springfield, MO, for Mr. B's Pool Centers.

## OPINION

RICHARD D. TAYLOR, Bankruptcy Judge.

Before the Court is the Debtor's Proposed First Amended Plan of Reorganization and First Amended Preconfirmation Changes to Debtor's First Amended Plan

of Reorganization [collectively the Plan] filed by the debtor, Hoffinger Industries, Inc. [the debtor]. The Plan drew several objections. Lessa Bunch [Bunch] and McMasker Enterprises, Inc. [McMasker] filed and actively litigated a comprehensive objection. Aurea, Inc.; William Ross Riddy; Mr. B's Pool Centers, Inc.; and David A. Grace as the Future Claims Representative also filed objections.[1] While these objections were general in nature, their particular concerns were more limited than those important to Bunch. The confirmation hearing began on December 14, 2004. For the reasons stated below, the objections to confirmation are sustained.

## JURISDICTION

This Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and it is a core proceeding under 28 U.S.C. § 157(b)(2)(L). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## GENERAL BACKGROUND

The debtor manufactures above ground swimming pools, vinyl ladders, filters, and pool accessories with its principal manufacturing facility located in West Helena, Arkansas. On August 23, 2001, Bunch obtained a $13,522,177 personal injury judgment against the debtor in the Superior Court of Glenn County, California. In the same case, McMasker obtained a $1,000,000 judgment against the debtor. Bunch filed her judgment in both California and Arkansas in an effort to obtain

liens on the debtor's assets.[2] Immediately thereafter, on September 13, 2001, the debtor filed its Chapter 11 petition.

During the pendency of much of this bankruptcy proceeding, the Bunch and McMasker judgments have been on appeal. The California Court of Appeals affirmed the judgments on November 8, 2004.[3]

The Plan confirmation hearing was originally scheduled to commence on November 22, 2004. The Court sua sponte continued the hearing because the night before the hearing the debtor filed substantive amendments that had not been subjected to creditor scrutiny as required by Federal Rule of Bankruptcy Procedure 3019. Following proper notice and service, the Court found that the amendments did not adversely change the treatment of accepting parties and the confirmation hearing could proceed.

This bankruptcy proceeding is remarkable in two respects. First, the debtor has used the bankruptcy in lieu of an appeal bond relative to the adverse California personal injury judgment. Bunch, the successful California plaintiff, has not moved to convert or dismiss the three year old case.[4]

Second, despite the debtor's assertions to the contrary, this is essentially a garden variety Chapter 11 reorganization. The debtor is a manufacturing entity with typical trade debt, secured debt—fixed asset and line of credit—and a long history of adequately addressing and managing product liability cases. In fact, claims prior to

---

1. By previous Court order, North American Pool Company and Cornelius Pools, LLC, were not permitted to participate in the confirmation hearing.

2. These filings were the subject of preference litigation in which the Court ruled in favor of the debtor.

3. The debtor has indicated that a request for rehearing was denied, but that it intended to appeal the California Court of Appeals's decision to the California Supreme Court.

4. The Office of the U.S. Trustee has remained inactive as well.

the Bunch case have been routinely and adequately handled in conjunction with a single customer captive insurer, which has been profitable enough to loan indirectly substantial sums back to the debtor. The debtor's reorganization has been complicated by its (a) refusal to either actively pursue or satisfactorily explain facially suspect insider transactions, and (b) consistent efforts to promote settlements, mass tort liability projections, and a plan that involve misclassifications and releases directed almost exclusively at Bunch. Simply stated, the debtor is unwilling to acknowledge that it has lost the Bunch case. Bunch is a non-contingent, known creditor in a fixed amount. She is not a component in a potential liability calculation;[5] she must be accounted for and properly treated.

LAW

■ In order for a plan to be confirmed, it must meet the requirements set forth in 11 U.S.C. § 1129(a). One of those requirements is that each class has either accepted the plan or is not impaired under the plan. 11 U.S.C. § 1129(8). Understandably, not all reorganization plans proceed with the acceptance of all parties. Such is the case here. Regardless, confirmation may be desirable and can still be obtained even though the plan is not accepted by all impaired classes. Section 1129(b) of the bankruptcy code allows non-consensual confirmation, or "cramdown," if all of the provisions of § 1129(a) except subsection (8) are met. Section 1129(b) states, in relevant part,

> if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1). The plan proponent carries the burden of proof by a preponderance of the evidence. *In re Union Fin. Serv. Group, Inc.*, 303 B.R. 390, 421 (Bankr.E.D.Mo.2003).

THE PLAN–GENERAL

The Court entered its order approving the debtor's disclosure statement on September 7, 2004, allowing the debtor to submit its plan to creditors for voting. According to the debtor's Ballot Tally, Exhibit H–10, all classes of creditors except one voted to accept the Plan. Because of the rejecting class, the debtor proceeded to confirmation with a cram-down plan.

In the Plan, creditors are divided into four classifications—Priority Wage Claims, Secured Claims, Unsecured Claims, and Interests—consisting of a total of ten classes. Class A consists of all claims entitled to priority under § 507(a)(3). It is unimpaired and the debtor proposes to pay Class A claims in full on the effective date of the plan.

Classes B–F consist of all the secured claims against the debtor. Class B involves the claim of CMA, which, with some conditions, will also be paid in full on the effective date of the plan. Class C involves the claim of JM Capital Finance Co., Ltd. The Plan proposes to pay Class C $2,000,000 on the effective date and the balance over 84 months. Class D is the claim of Taylor Contracting and is disallowed under the Plan. Classes E and F are dressed below.

---

5. The issue of her disparate treatment based on alleged insurance coverage will be ad-

disputed claims, both of which the debtor has sought, or is seeking, to avoid. Class F involves the secured portion of the Bunch claim.

Classes H–J [6] consist of all the unsecured claims against the debtor. Class H is a convenience class in which the debtor proposes to pay in full all unsecured claims of $5000 or less. Class I includes the unsecured claims of seven personal injury claimants, including the unsecured portion of the Bunch claim,[7] and all other unliquidated personal injury claimants. With the exception of the Bunch and McMasker claims, these claims are unliquidated, contingent, or disputed. The debtor proposes to pay this class according to a formula that will be discussed in detail below. Class J consists of all other claims not otherwise classified, including general unsecured claims based on rejection of leases and executory contracts, trade credit, and judgments not related to personal injury. The debtor proposes to pay this class either 30 percent of each allowed claim, or 10 percent of each allowed claim, depending upon the entry of a final order in the Bunch preference action mentioned in footnote 7.

The final class, Class K, consists of all equity interests in the debtor. The debtor proposes to cancel all equity interests in the debtor as of the effective date of the Plan.

The Plan also contemplates the infusion of new equity through a contribution from New Equity Investors in the amount of $4,000,000, paid in cash on the effective date of the Plan. According to the Plan, the New Equity Investors are comprised exclusively of some or all of the current shareholders of the debtor. In exchange for new equity, the New Equity Investors shall receive common stock in the Reorganized Debtor. The Plan also contemplates the creation of a Hoffinger Creditor Trust fund to disburse a product liability fund to Class I creditors. The trust will be funded by a $3,000,000 payment from the debtor to the product liability fund, as well as a Fully Funded Amount and Net Products Liability Indemnification Proceeds, both of which are described in detail below. The Plan also includes a channeling injunction that states that after confirmation of the debtor's Plan, "all lawsuits or Claims of Unliquidated Personal Injury Claimants against the Debtor or Reorganized Debtor shall be enjoined ... and such claims upon becoming Allowed Claims may only be asserted against the Reorganized Debtor's Product Liability Fund ...." Plan Art. IX § 9.05.

## PLAN CONFIRMATION

Four general areas dictate that the Plan is not confirmable. They involve the liquidation analysis, claims classifications, absolute priority rule, and releases. Each will be discussed in detail below. A secondary issue involving the debtor's insurer is also pertinent to this opinion and is the topic of a separate discussion.

## LIQUIDATION ANALYSIS

■ To be confirmed, a plan must meet the "best interests of creditors test," codified at 11 U.S.C. § 1129(a)(7). This requires that non-accepting impaired classes must "receive or retain under the plan ... property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated

---

**6.** Class G was intentionally omitted by the debtor.

**7.** At this time, the entire claim of Bunch is unsecured as a result of a preference action brought by the debtor, the result of which was the setting aside of Bunch's liens on the debtor's property.

under chapter 7 ...." This typically entails a hypothetical chapter 7 liquidation analysis as of the effective date of the plan. The burden of proof is on the plan proponent to establish that its plan meets this test. *In re Affiliated Foods, Inc.*, 249 B.R. 770, 787 (Bankr.W.D.Mo.2000).

The debtor prepared a liquidation analysis [8] that suggests a potential $2,936,866 distribution to unsecured creditors. This amount is, of course, less than the contemplated $4,000,000 equity contribution and the subsequent anticipated distribution to unsecured creditors based on the Plan and the debtor's continued operation.

The Court accepts for purposes of this opinion the values outlined in the liquidation analysis. The debtor's analysis reflects cash generated from liquidation in the amount of $23,074,581. Then, the analysis calculates payments to secured and priority claimants to arrive at an amount available for distribution to unsecured creditors under chapter 7.[9] Two significant entries occasion the Court's concern relative to the intrinsic viability and accuracy of the liquidation analysis.

First, there is the question of full payment of $12,363,282 to JM Capital Finance Company, Ltd. [JMC]. It is not automatic that this credit is enforceable as representative of actual credit extended. Alternatively, it may be subject to equitable subordination. In fact, Bunch has filed an adversary proceeding seeking just such relief. Either scenario would have a significant impact on the amount available for payment to unsecured creditors. However, neither the liquidation analysis or Plan outlines or reorders payments in the event

of a decision adverse to JMC in the subordination litigation.

This is not to suggest that the Court has made a finding or drawn any conclusions on this particular issue. The JMC transaction simply represents an area that requires additional scrutiny or, at least, a more exacting explanation from the debtor. The debtor and JMC entered into a Statute of Limitations Extension Agreement post-petition. However, at the confirmation hearing, the debtor was reluctant or unable to articulate what causes of action might exist against JMC that necessitated the tolling agreement and what its intentions were with respect to either pursuing or abandoning these potential causes of action. The debtor built into its Plan a number of alternatives based on the wisp of a chance that it could reverse the affirmed Bunch verdict. Contrarily, the debtor was unwilling even to consider any scenario other than accelerated full payment to JMC regardless of a pending adversary proceeding, questions concerning the validity of its debt, and an executed but unexplained tolling agreement.

Second, there is the question of the $4,536,410 payment to Arrowhead Insurance Company, Ltd. [Arrowhead].[10] This insurance creditor will be discussed in more detail below. For purposes of this discussion, two factors immediately become self evident. First, the approximately $4,500,000 debit on the liquidation analysis ignores the corresponding receivable of anywhere from $2,000,000 to $3,000,000. Presumably, at liquidation, the accrued premiums would be paid (as set forth in the debtor's liquidation analysis). Payment of the premiums would, in turn, pre-

---

**8.** Liquidation Analysis, Ex. H–54.

**9.** Presuming secured and administrative claims would be paid to the allowed extent of their claims.

**10.** There is a similar Statute of Limitations Extension Agreement between Arrowhead and the debtor.

cipitate Arrowhead's obligation to make payments on the estimated and currently existing four to six tort claims other than Bunch.[11]

This balance sheet omission crystallizes the second inherent infirmity in the liquidation analysis relating to Arrowhead. Specifically, it strains credulity and basic sound business sense for the debtor to pay, much less treat as an administrative priority, a $4,500,000 debt that carries an expected $2,000,000 to $3,000,000 reimbursement. Dependent upon the judgment amount and number of successful tort claimants, the debtor's liquidation analysis relative to Arrowhead alone is understated by at least $1,500,000 and possibly as much as $2,500,000. Also, because the policy is a reimbursement policy and not a risk shifting policy, the premiums to return ratio might possibly be even more favorable to Arrowhead to the detriment of both the debtor and its unsecured creditors, including successful tort claimants. The liquidation analysis is seriously understated. For this reason, the Plan fails to satisfy the best interests of creditors test.

CLAIMS CLASSIFICATION AND TREATMENT—TORT CLAIMANTS

Under 11 U.S.C. § 1129(a)(1), a plan must comply with the applicable provisions of title 11. One of those provisions, § 1122(a), states that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Additionally, under § 1129(b)(1), the Court must make a deter-

mination that a plan does not discriminate unfairly, and is fair and equitable, with respect to each impaired non-accepting class. Bunch has asserted that the Plan discriminates unfairly. She is correct.

■■■ A plan discriminates unfairly "only if similar claims are treated differently without a reasonable basis for the disparate treatment." *In re Union Fin. Serv. Group, Inc.*, 303 B.R. at 421 (citing numerous cases in support). There is a four-part test to determine whether a plan discriminates unfairly:

1. whether the discrimination has a reasonable basis;
2. whether the debtors can carry out the plan without discrimination;
3. whether the discrimination is proposed in good faith;
4. whether the degree of discrimination is directly related to the basis or rationale for the discrimination, i.e., does the basis for the discrimination demand that this degree of differential treatment be imposed.

*In re Apex Oil Co.*, 118 B.R. 683, 711 (Bankr.E.D.Mo.1990) (citing *In re Wolff*, 22 B.R. 510, 512 (9th Cir. BAP 1982); *In re Rochem, Inc.*, 58 B.R. 641, 643 (Bankr. D.N.J.1985)).

■■■ In this case, the Plan creates Class J, which can be characterized generically as the general unsecured claims class. It includes claims for rejection of leases and executory contracts, trade credit, and "judgments not related to personal injury." Plan Art. III(c)(3).[12] The Plan proposes to

---

11. As will be discussed below, it is not even certain that full payment of the accrued premiums will precipitate an obligation on Arrowhead's part, as this is an indemnity policy, not a risk shifting policy. Also, there appears to be some confusion as to the number of tort claimant's other than Bunch. The debtor's president at one time testified that were four

other claims though the record may reflect that the actual number might be more accurately stated as six.

12. The Plan contemplates a convenience class pursuant to § 1122(b), which is acceptable under the Code and the facts presented at trial.

pay general unsecured creditors 30 percent of their allowed claims in three equal annual installments.[13]

In comparison, Class I can be characterized as the aggregate of the tort claimants against the debtor. This class consists of seven specifically enumerated persons or entities, including the unsecured portion of Bunch's allowed claim,[14] plus the claims of all other Unliquidated Personal Injury Claimants. Unliquidated Personal Injury Claimants are defined as persons having personal injury claims against the debtor that have not been liquidated and arise out of accidents that occurred before the confirmation date related to products sold by the debtor prepetition. These could include persons and accidents unknown to the debtor and form part of the basis for the denominator referenced in Exhibit H–69, discussed below.

Three things characterize Class I. First, relying simply on the Plan it is almost impossible to ascertain adequately and accurately the treatment of each individual claimant. This confusion is highlighted and exacerbated by inconsistent and confusing testimony and at least one exhibit that clouds, rather than sheds light, on the issue. Second, the proposed Class I treatment attaches as much priority and deference to unliquidated known and unknown claimants as it does to known and, in the case of Bunch, liquidated claims. Bunch is the sole liquidated claim relegated to this class. Third, the commensurate classification and distribution scheme clearly and unequivocally discriminates unfairly against Bunch.

While not exhaustive of the inconsistencies adduced at trial, a comparison of the Plan and debtor's Exhibit H–69 highlights the first two problems. Exhibit H–69 is an analysis of payments to Class I claimants assuming a $5,000,000 allowed claim with legal expenses of $250,000, and provides, in pertinent part, as follows:

Example 1—Arrowhead Insurance—$50,000 deductible, $500,000 per occurrence, $5,000,000 Aggregate

| | | |
|---|---|---|
| Tier 1: | First $50,000 pays (Deductible, "Fully–Funded Amount") | $ 15,000 |
| Tier 2: | Next $500,000 pays (Insurance proceeds, "Full [sic]-Funded Amount") | $ 500,000 |
| Tier 3: | ($5,000,000–$550,000) x (3,000,000/$28,000,000)= | $ 476,150 |
| | Total: | $ 991,150 |

*Effective September 1, 2003—Current (New Policy Limits)*

Example 2—Arrowhead Insurance—$50,000 deductible, $1,000,000 per occurrence, $5,000,000 Aggregate

| | | |
|---|---|---|
| Tier A: | First $50,000 pays (Deductible, "Fully–Funded Amount") | $ 15,000 |
| Tier B: | Next $500,000 pays (Insurance Proceeds, "Full [sic]-Funded Amount") | $ 500,000 |
| Tier C: | $500,000–$250,000 (Insurance proceeds/"Net Products Liability Indemnification Proceeds") | $ 250,000 |
| Tier D: | ($5,000,000–$800,000) x ($3,000,000/$28,000,000)= | $ 449,400 |
| | Total: | $1,214,400 |

This exhibit probably reflects accurately the debtor's intended Plan distribution scheme. However, there was confused and conflicting testimony on this point and, in fact, the Exhibit H–69 distribution scheme is not as the Plan provides. The Plan states as follows:

(c) Class I Allowed Claims in excess of $50,000 shall be paid first from the Fully Funded Amount plus, if applicable, the Net Products Liability Indemnification Proceeds and the balance, if any, of such Class I Allowed Claim … shall be paid from the Product Liability Fund pursu-

---

**13.** An alternate schedule involving a 10 percent payment in the event of a reversal of the Bunch preference decision currently favorable to the debtor is ignored for purposes of this opinion.

**14.** At this time it represents the entirety of her claim due to the favorable ruling obtained by the debtor in the Bunch preference litigation.

ant to Article IX and other provisions of the Plan.

Plan Art. IV § 4.09(c).

The Plan definition of "Fully Funded Amount" encompasses and references both the $15,000 (in other words, the first tier), and the next $500,000 (in other words, the second tier):

> "Fully Funded Amount" shall mean the amount to be paid to holders of Class I Allowed Claims ..., which Fully Funded Amount shall equal $15,000 plus the Allowed Amount of the Class I Claim (less $50,000) or $500,000, whichever is less.

Plan Art. I § 1.65.

The Plan goes on to define Net Products Liability Indemnification Proceeds as,

> the amount, if any, in excess of $500,000, determined to be payable by Arrowhead Insurance Company, Ltd. or other insurer to debtor pursuant to the policy of insurance/indemnity issued by such insurer, on account of, or as a result of, a Class I Claim being determined to be a Class I Allowed Claim ... pursuant to a Final Order less the costs and expenses including attorneys fees incurred by Debtor in the process of defending and liquidating the Class I Claim.

Plan Art. I § 1.73.

From this language, it is reasonable for any Class I Claimant to believe, regardless of the September 1, 2003, change in insurance coverage, that they are entitled to the benefits of Tiers 1 and 2, or A and B, regardless of insurance, and that there should exist a Tier 3 similar to Tier C, and then a Tier 4 that mirrors Tier D. It is reasonable reading the Plan, but apparently incorrect according to Exhibit H–69, to read payment from the Net Products Liability Indemnification Proceeds as a Tier 3 benefit and the Product Liability Fund as a Tier 4 benefit.

The Plan and Exhibit H–69 are not consistent, especially when coupled with the trial testimony. A great deal of the uncertainty and confusion seems to originate from whether an accident was before or after September 1, 2003—the date Arrowhead insurance coverage increased from $500,000 to $1,000,000 per occurrence. The Plan does not draw an adequate distinction on this basis. This ambiguity is significant and fatal.

The Bunch claim arose prior to September 1, 2003. In fact, it appears that only one known claim occurred after September 1, 2003. However, there was testimony on behalf of the debtor that seemed to create four tiers for pre-September 1, 2003, injuries that apparently are not actually contemplated by the Plan, given Exhibit H–69. However, if you literally apply the Plan definition of Fully Funded Amount, paragraph 4.09(c) of the Plan does specifically create four tiers, even for pre-September 1, 2003, claims. Exhibit H–69 directly contradicts paragraph 4.09(c).

The Tier 1 and 2 treatments contemplated in Example 1 on Exhibit H–69 reflect first a payment of 30 percent of the $50,000 deductible, then $500,000 from "Insurance proceeds, 'Full [sic]-Funded Amount'." An examination of the Plan reflects that the term Fully Funded Amount seems to have nothing to do with insurance. Again, this term is defined in Section 1.65 as "the amount to be paid to holders of Class I Allowed Claims ... in amounts greater than $50,000, which Fully Funded Amount shall equal $15,000 plus the Allowed Amount of the Class I Claim (less $50,000) or $500,000, whichever is less." Part of the debtor's testimony seemed to reflect that this amount was simply something to be paid by the debtor. From both his testimony and the Plan itself, that would seem to be the case, but would make them fully inconsistent with

Exhibit H–69, which indicates Tier 2 benefits are derived from "insurance proceeds."

From the wording of the Plan, the first time insurance seems to apply is with respect to a second $500,000 payment. Article I, Section 1.73 of the Plan also defines Net Products Liability Indemnification Proceeds and buttresses the argument that the first $500,000 does not relate to insurance and that the second $500,000 is where the Arrowhead indemnification applies.

The Plan definition of Net Products Liability Indemnification Proceeds is "the amount, if any, in excess of $500,000, determined to be payable by Arrowhead Insurance Company, Ltd. or other insurer to Debtor pursuant to the policy of insurance/indemnity issued by such insurer . . . ." The only way to read this definition and the Fully Funded Amount definition and reconcile them with Exhibit H–69 is to assume (1) "if any" modifies not the "amount," as it seems, but the extent of insurance coverage, (2) the fact that the coverage from Arrowhead changed on September 1, 2003, (3) that the debtor did, in fact, expect reimbursement from Arrowhead for the first $500,000 payment for pre-September 1, 2003, claims, and (4) that despite the expected reimbursement, the debtor was waiving the "wasting" aspect of the Arrowhead indemnity policy that paid only for amounts paid by the debtor after deduction of fees and costs incurred by the debtor. None of this is at all clear from the Plan.[15] Also, the waiver of the "wasting" aspect of the indemnity policy is effectively selective, affecting mostly Bunch.

Initially, this would seem to be to her benefit. However, the net effect is to justify categorizing her in Class I to her ultimate detriment.

The debtor's argument that Bunch should be classified in Class I and treated differently than general unsecured creditors is based on an assertion that each tort claimant has available insurance. The testimony does not support this. According to the debtor, the Arrowhead policy is a wasting policy. Arrowhead reimburses the debtor only for amounts the debtor has to pay. The debtor is entitled to reimburse itself first its litigation costs and expenses. The policy is not a risk shifting policy that protects injured third parties. In Bunch's case, the entire $500,000 amount from Arrowhead has been exhausted by attorney fees and costs. Arrowhead has already indemnified the debtor with regard to the Bunch claim. Nothing from the Arrowhead insurance policy has inured, or will in the future inure, to Bunch's benefit.[16]

The debtor's president testified that Bunch's claim would still receive the $500,000 without deduction for litigation fees or costs. If the Reorganized Debtor is suggesting that it will simply bestow the $500,000 on Bunch, the debtor must explain why she, with no insurance funds available, is receiving that amount when presumably others—for instance, those that fall in the Example 2 category, Exhibit H–69—receive their initial $500,000 from insurance proceeds (according to Exhibit H–69) and not funds from the Reorganized Debtor, and deductions are made from the

---

**15.** "Right. We've eliminated the wasting part for the plan, the first tier. Maybe that's where the confusion is." Hollowell Test. vol. 1 p. 204; *see also* Plan Art. VIII § 8.01. The first two paragraphs strongly lend credence to the argument that any claimant, before or after September 1, 2003, is entitled to the first

$15,000, then the first $500,000 from the Reorganized Debtor, then the Arrowhead reimbursement for the second $500,000.

**16.** Bunch is a pre-September 1, 2003, claim, so the increased policy limit does not apply to her claim.

second $500,000 when none were made in Bunch's case. In fact, if credence is given to amended Section 8.01(a), Bunch and the other Class I claimants are supposed to receive the initial $500,000 from the Reorganized Debtor. However, the debtor's best effort at explaining proposed payments under the Plan, Exhibit H–69, simply does not say that and completely contradicts the Plan.

Having said all that, the simple explanation may be that everything was done to make sure that most of the Class I claimants receive distributions at least equal to or greater than the general unsecured claimants, with the exception of Bunch. Using Exhibit H–69, there are possible scenarios that the Court can deduce to make it consistent with parts of the Plan, at least by ignoring certain phrases or provisions. However, a plan is a contract between the parties. It should be clear and unambiguous. The parties, and the Court, should not be required to guess, speculate, or torture the sentences to devine the meaning of a plan. Quite simply, Exhibit H–69 probably reflects the Plan's intended distribution. The Plan, which controls, needs to say so in clear and unambiguous language.

Regardless, one additional thing is abundantly clear. Class J general unsecured claims are scheduled to receive 30 percent of their Allowed Claims. According to the debtor, any Class I claimant with a claim under $2,600,000 will receive an amount approximately at or above 30 percent.[17] The only Class I claimant above $2,600,000 is Bunch. The debtor's testimony was that she would receive approximately 20 percent of her claim while everyone else in both Classes I and J would receive no less than 30 percent. Bunch is a known, liquidated, judgment creditor. Not only does the distribution represent unfair discrimi-

nation, it is also an inappropriate classification. No distinction exists justifying a gerrymandered classification resulting in a diminished distribution to Bunch.

The insurance distinction argument is chimerical if you literally apply Example 1 in Exhibit H–69. Any Arrowhead indemnity that would have helped Bunch has already been paid to the debtor. In other words, "wasted" away already. However, the debtor apparently proposes to pay Bunch from its own funds. Hence, by Bunch no longer having any insurance, and by the debtor preferring her with a gratuitous payment not subject to insurance indemnification, she is now bootstrapped into a class in which everyone but her will receive at least 30 percent of their claim.

The testimony does not reflect that any other Class I claimant has had the Arrowhead policy completely wasted away. Therefore, each dollar they should receive over what Bunch should receive from the Arrowhead indemnity, which is zero, defines the extent of the gratuitous payment to Bunch in relation to each individual Class I claimant, up to the $500,000 she is scheduled to receive. The gratuitous "insurance" payment, not from insurance but from the Reorganized Debtor, is used as the sole excuse to award her a much lower percentage than general unsecured creditors and other members of Class I who do not get the same gratuitous non-insurance insurance payment. This result defies logic and is not appropriate.

## ABSOLUTE PRIORITY RULE

■ Without consideration of the new value exception, the Plan violates the bankruptcy code's absolute priority rule. Under § 1129(b), in addition to not discriminating unfairly, a plan must be "fair and equitable." A plan is fair and equita-

---

**17.** Analysis of Payout to Unsecured Creditors,    Ex. H–40A.

ble if "(i) no class senior is paid more than in full and (ii) no class junior will receive or retain any interest in property under the Plan." *In re Union Fin. Serv. Group, Inc.*, 303 B.R. at 423. Section 1129 of the code requires that for a plan to properly avoid full payment to a class of rejecting unsecured claims, "the holder of any claim or interest that is junior to the claims of such class [may] not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). In plain English, "the provision bars old equity from receiving any property via a reorganization plan 'on account of' its prior equitable ownership when all senior claim classes are not paid in full." *Bonner Mall P'ship v. U.S. Bancorp Mortgage Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 908 (9th Cir.1993). In this instance, the previous equity owners will retain the equivalent of their previous equity ownership in full in the Reorganized Debtor in violation of the absolute priority rule.

▮ In exchange, and in an effort to adhere to the elements of the new value exception to the absolute priority rule, the equity owners will make a $4,000,000 contribution to the Reorganized Debtor at confirmation. For purposes of this opinion, the Court accepts that a "new value" exception exists. The generally accepted elements are that the value be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization and (5) reasonably equivalent to the value or interest received. *Id.*

▮ The record is clear that the proposed contribution is money or money's worth and is necessary for a successful reorganization. It is not entirely clear that the other elements are met. Specifi-

cally, the contribution must be new. In most instances, this is a given. However, in this case, confirmation of the Plan will result in immediate payments to related parties (Arrowhead and JMC) in amounts in excess of $4,000,000. Creditors raised the question of whether the funding source was, in fact, from the debtor through these entities and back to the Reorganized Debtor. Despite inquiry, no one representing the debtor could testify as to the source of these funds. Failing to do so when consistently questioned on the issue raises sufficient doubt as to whether the contribution will, in fact, be "new." The debtor could have easily resolved this issue but chose not to do so and, accordingly, failed to meet its burden in this regard.

Additionally, the value must be substantial and reasonably equivalent to the value or interest received. The debtor's liquidation analysis and the Mercer Capital business valuation report both address these issues.[18] The liquidation analysis suggests that only $2,936,866 would be available for distribution to unsecured creditors in a hypothetical chapter 7 liquidation. The Mercer Capital report asserts a stock valuation of $1,047,000, well below the $4,000,000 proposed new value contribution. However, both the liquidation analysis and the business valuation report presuppose a payment of approximately $4,500,000 in accrued insurance premiums to Arrowhead and an initial payment in excess of 4 million dollars to JMC to be applied against accrued principal and interest. These figures, as well as the supposition that the JMC indebtedness is valid and enforceable, or not otherwise subject to subordination, significantly impact the liquidation and valuation analysis.

18. Primarily the Mercer Capital report, although the liquidation analysis indirectly supports the basic premises of the report and the probable value effect of a liquidation.

The appropriateness of the Arrowhead debt will be discussed below. Also, as previously stated, the JMC indebtedness is the subject of an adversary proceeding seeking, inter alia, the voiding or subordination of this debt. Despite tolling agreements that appear to recognize potential causes of action by the debtor against these and other entities, the Plan does not consider or provide for alternatives based upon subsequent events. The debtor has built-in alternatives with respect to the Bunch preference action as well as numerous mathematical alternatives involving tort claims litigation, but has failed or refused to do the same relative to JMC given the reality of the outstanding subordination litigation.

Also, it is arguable that Plan confirmation would result in a res judicata or collateral estoppel effect that could moot the adversary proceeding as well as any critical examination of the Arrowhead and JMC relationships. Further, the valuation analysis may change significantly depending upon the adversary proceeding result. The Court cannot conclusively accept the Mercer report given the uncertainty of the adversary proceeding result and its potentially significant impact on the stock valuation.

Objections based on the United States Supreme Court decision in *Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999), are not applicable in this instance. Specifically, the Supreme Court determined that the exclusive right of the old equity holders to propose a plan and infuse it with new capital was a property right that should be value tested on the open market with the opportunity for other parties to submit competing plans or offer competitive bids.

*Id.* at 454–55, 119 S.Ct. 1411. In this instance, the exclusivity period has terminated; a competing plan has, in fact, been filed; and the appropriateness and sufficiency of the new value tendered has been raised and subjected to Court scrutiny. Further, although the Plan did not provide a vehicle for competitive access or a market value vetting, the only proof on the record of a potential interested third party was from the party that has, in fact, filed an alternative plan.

RELEASES

█ Included within the Plan is Article XVI, Discharge, Releases, Transfer of Causes of Action and Claims to Debtor [generically, the Release]. The Release is both ambiguous and, because of broad inclusive language, inappropriate under the Code. This finding is appropriate with respect to all interested parties and specifically appropriate with respect to unique causes of action apparently enjoyed by Bunch in the context of her California litigation. Bunch is pursuing litigation in California ancillary to her original proceeding in which she is attempting to enforce against other parties, generally characterized as related to the debtor,[19] her favorable judgment. Of course, this Court cannot and does not make any findings with respect to the validity of this ancillary litigation.

The Release was extensively discussed and examined during trial. Direct questions were posed to the debtor's president concerning the exact scope and inclusiveness of the Release. Objections were raised on the basis that the president's understanding of the Release would amount to legal conclusions. However, a plan is a contract and the debtor should be able to state what its intentions were in

19. The shareholders and most of the directors and officers of the Debtor and Reorganized Debtor are the same, and Bunch is pursuing many of them in the California litigation.

formulating the Release language. Further, the Release language itself should be clear and unambiguous. This issue is especially important regarding whether the Release could be used as a defense by the non-debtor entities in Bunch's ancillary litigation. In this instance, the language is not clear and the debtor was unable to clarify either the debtor's intentions or the consequences of what should be clear and unequivocal contractual language.

Section 16.01 of the Plan, Discharge of the Debtor and Release of Claims Against Debtor and Related Parties, could arguably release third party non-debtors from any causes of action Bunch or other creditors may have. Although the debtor specifically deleted references to officers, directors, shareholders, and other related parties, the predicate language of this section continues to be ambiguous and leaves room for argument that the deleted parties still enjoy the benefits of the Release.

> Specifically, the Release provides,
>
> [e]ffective as of the Confirmation Date . . ., the distributions and rights that are provided in this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of all Claims of any nature whatsoever against, liabilities of, Liens on, obligations of and Equity Interests of the Equity Holders in the Debtor . . . .

Plan Art. XVI § 16.01. This language does not conclude litigation, but rather fosters it. As previously stated, the mere fact that the debtor's representative could not conclusively and affirmatively exclude other parties from the ambit of the Release serves to emphasize its inherent ambiguity. The above language could easily be construed to release the liabilities of any Equity Holder to any Claimant. This would include Bunch and parties Bunch is pursuing in her California litigation. All claimants, including Bunch, are entitled to clearly know who is released and to what extent.

The Release has other fatal provisions. Section 16.04, titled Exculpation and Limitation of Liability, states as follows:

> Except as otherwise specifically provided in this Plan, neither the Debtor nor Reorganized Debtor, Disbursing Agent, Personal Injury Agent nor any statutory committee (solely with respect to its conduct as a committee and not with respect to the actions of its members as individual creditors), nor any of such parties' respective present members . . . or any of such parties' successors and assigns, shall have or incur, and are hereby released from, any Claim, obligation, cause of action or liability to one another or to any holder of a Claim or an Equity Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisers, attorneys, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Bankruptcy Case, the pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under the Plan, except for their willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

Plan Art. XVI § 16.04.

Limited redaction of the above results in the following language:

> [N]either the Debtor nor Reorganized Debtor . . . shall have or incur, and are hereby released from, any Claim, obligation, cause of action or liability to one another or to any holder of a Claim . . . , or any other party in interest, . . . for any act or omission in connection with, relating to, or arising out of, the Bank-

ruptcy Case, ... the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for their willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

■■■ The clear net effect of the above is that the Reorganized Debtor will not even be liable for a simple breach of the Plan that under general contract law would result in a suit for damages. To be actionable, a breach requires "willful misconduct" with the added defense of reasonable reliance on counsel. Such a clause is unconscionable and results in a contract that does not give rise to causes of action in the breach, but only as a result of a breach coupled with willful misconduct. And even that is potentially mitigated by reliance on the advice of counsel. Further, although the reliance must be reasonable, there is no similar restriction on the advice. Quite simply, a confirmed plan should be enforceable and amenable to damages between contractually bound parties.

In Section 16.06, the Plan goes on to create an injunction affecting creditors generally. The injunction also appears to release non-debtor parties, which, in conjunction with the general release language above, appears to relate specifically to the third party claims being asserted by Bunch in her California litigation. Again, redaction results in the following language:

> [A]ll persons who have held, hold or may hold Claims ... shall be precluded and permanently enjoined ... from (a) commencing or continuing in any manner any Claim, action or other proceeding or [sic] any kind *with respect to any Claim,* ... or any other right or Claim against the Debtor or Reorganized Debtor,

which they possessed or may possess prior to the Effective Date, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order with respect to any Claim ... or any other right or Claim against the Debtor or Reorganized Debtor which they possessed or may possess prior to the Effective Date ..., and (d) asserting any Claims that are released hereby.

Plan Art. XVI § 16.06 (emphasis added). The highlighted language has the arguable effect of releasing these other related parties both generally with respect to debtor or third party claims, and, perhaps, specifically with respect to the litigation being pursued by Bunch.

■■ To be confirmable, a plan must comply with all applicable provisions of the bankruptcy code. 11 U.S.C. § 1129(a)(1). Section 524(e) provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). The courts appear to employ a balancing test in instances where they have concluded that § 524(e) is not restrictive and that it does permit, under certain circumstances, injunctions that extend to non-debtor third parties. There are five nonexclusive factors pertinent to this analysis:

> (1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.
>
> (2) The non-debtor has contributed substantial assets to the reorganization.
>
> (3) The injunction is essential to reorganization. Without it, there is little likelihood of success.
>
> (4) A substantial majority of the creditors agree to such injunction, specifical-

ly, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.

(5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

*In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 934–35 (Bankr.W.D.Mo.1994) (footnotes omitted).

In applying this balancing test, the Court concludes that the Release is inappropriate. As to the first factor, there was no evidence introduced sufficient to reflect an identity of interest between the debtor and the third parties. In fact, it might be in the debtor's best interest, and commensurately its creditors' best interest, if Bunch obtained a judgment and collected some of its claim from one or more of the third parties.

As to the second factor, it is known that, if confirmed, there will be a $4,000,000 contribution to the Reorganized Debtor. What is not known is who or in what proportion this amount will be paid by either the equity owners or the specific class against whom Bunch seeks recovery. Accordingly, the second element weighs against the appropriateness of any release language enuring to the benefit of third parties.

As to the third, fourth, and fifth factors, the debtor produced no evidence that an injunction in favor of third parties was essential to reorganization. Although many classes voted for the Plan, the Plan fails to provide for the payment of all, or substantially all, of the claims of the class, and most particularly of Bunch, specifically and perhaps pointedly affected by the injunction.

### ARROWHEAD INSURANCE COMPANY, LTD

Arrowhead is the insurance company that provides coverage to the debtor. Historically, this entailed a $50,000 deductible with a $500,000 occurrence limit and a $5,000,000 annual aggregate. This entity has at various times been characterized as a "captive" insurance company. Suffice it to say that the insurance company shares common ownership with the debtor, the debtor is its only customer, and the debtor's paid premiums have been sufficiently profitable for Arrowhead to loan money in turn back to the debtor through a third party related entity.

The Arrowhead policy is an indemnification policy, sometimes referred to as a "wasting" policy. It does not appear to be a risk shifting policy in that it does not facially enure to the benefit of the tort claimant. Rather, it indemnifies the debtor first for litigation fees and costs and then, subject to the policy limits, for any amount the debtor has to pay a successful tort claimant.

The "wasting" aspect of the policy again calls into question the debtor's liquidation analysis. More specifically, the debtor's liquidation analysis reflects an administrative priority payment of accrued premiums of approximately $4,500,000. In most instances, the payment of the insurance premiums would precipitate the obligation of the insurance company to make payments for claims arising during the coverage period. However, the liquidation analysis reflects that at liquidation, even if the accrued premiums were paid, the debtor would not in the course of liquidation be in a position to defend against claims and generally would not make compensatory payments to unliquidated tort claimants.[20]

---

**20.** The only possible exception would be a small pro rata distribution, presumably with other unsecured creditors vying for a piece of

Accordingly, Arrowhead might not have to reimburse the debtor and would be, in effect, reaping a windfall at the expense of the unsecured creditors.

Even if the accrued premium payment did somehow obligate Arrowhead to make payments for subsequently liquidated claims, that amount, presuming liquidation of the debtor, would at worst be approximately $3,000,000.[21] Again, a windfall to Arrowhead. However, more likely the known but unliquidated claims would not be paid by the debtor in a liquidation mode, thus freeing Arrowhead completely, an even greater windfall. These considerations also call into question the debtor's liquidation analysis and the extent to which the Arrowhead debt should be considered in assessing the debtor's liabilities in determining the appropriate new value contribution.

## CONCLUSION

For the reasons stated above, the objections to the Debtor's Proposed First Amended Plan of Reorganization and First Amended Preconfirmation Changes to Debtor's First Amended Plan of Reorganization are sustained. A competing plan has been filed by Leesa Bunch, McMasker Enterprises, Inc., Farmers Insurance Group, North American Pool Company, and its wholly owned subsidiary Cornelius Pools, LLC, which will be set for hearing by subsequent notice of the Court.

IT IS SO ORDERED.

---

the suggested $2,936,866 Liquidation Analysis pie.

**21.** The debtor would not be paying or accounting for unknown but accrued claims in a liquidation scenario and, thus, the indemnity

exposure would be limited to the six known claims other than Bunch, for whose claim Arrowhead has already indemnified the debtor to the policy limit.