WHISPERING PINES ESTATES, INC. d/b/a the Pines at Edgewood Centre and Ami–Burlington, Inc. d/b/a the Anchorage Inn, Debtors.

Whispering Pines Estates, Inc. d/b/a the Pines at Edgewood Centre, Appellant,

v.

Flash Island, Inc., Appellee.

BAP No. 06–059.

Bankruptcy Nos. 05–56003–MWV, 05–56004–MWV.

United States Bankruptcy Appellate Panel of the First Circuit.

June 28, 2007.

Robert J. Keach, Esq., Jennifer Rood, Esq., and Jessica A. Keating, Esq. on brief for Appellant.

William S. Gannon, Esq. on brief for Appellees.

Before HILLMAN, ROSENTHAL and SOMMA, United States Bankruptcy Appellate Panel Judges.

SOMMA, Bankruptcy Judge.

The debtor, Whispering Pines Estates, Inc., appeals from an order confirming the third-party plan put forth by its secured creditor, Flash Island, Inc. ("Flash Island"). Under the plan, the debtor's assets would be liquidated, either by a plan trustee or, if the trustee were unable to sell within a definite time, by Flash Island at foreclosure. The debtor appeals on the basis, among others, that the plan contains an impermissibly broad release of the plan proponent, in violation of 11 U.S.C. § 1129(a)(1) and (3). For the reasons set forth below, we agree that, at least as a release of a party responsible for imple-menting the plan, the release is overbroad. Accordingly, we reverse.

## I. BACKGROUND

The debtor operates an assisted-living facility for up to sixteen elderly residents in Portsmouth, New Hampshire. The debtor's most valuable asset is the real estate that is home to this facility. The value of the real estate is highly uncertain and has not been judicially determined; the parties have mentioned estimates ranging from a low of $700,000 to a high of $1,875,000, but it is unclear whether some or all of these valuations were for the real estate alone or for all assets of the debtor as a going concern. Flash Island holds the first and second mortgages on the real estate. The first mortgage secures a $425,000 loan from Flash Island to the debtor; the current balance on this loan is approximately $489,000. The second mortgage, which was originally given by the debtor to another party, was acquired by Flash Island after this case was commenced; the balance owing on it is approximately $920,000. The real estate is also encumbered by a federal tax lien, junior to the Flash Island mortgages, in the amount of $84,000, and by a municipal lien, senior to the Flash Island mortgages, in the amount of $22,512.71. It is not clear whether the State of New Hampshire also has a tax lien on the property.[1] In addition to its real property, the debtor owns personal property that it values in its schedules at a total of approximately $60,000. One or both of Flash Island's security interests extend to the debtor's cash, accounts receivable, and other personalty.

---

1. The State of New Hampshire has filed two proofs of claim in the case; both assert unsecured priority claims, and neither asserts a secured claim in the case. However, the plan at issue here makes provision for the tax claims of the State of New Hampshire, "to the extent" such claim qualifies as a secured claim.

In addition to the secured claims listed above, the debtor faces administrative claims for fees owed to debtor's counsel and to the United States Trustee, priority claims for taxes, and nonpriority unsecured claims. In addition to the assets listed above, the estate has two causes of action whose value and merits are uncertain. The first is for recovery of loans or preferential transfers to the debtor's principal, David Ramsey. The second is a right of action to avoid as fraudulent transfers both Flash Island's second mortgage and the $920,000 debt it secures. In support of this cause of action, the debtor alleges that the proceeds of the loan at issue were paid not to the debtor but to an affiliate.

In November 2005, the debtor, facing imminent foreclosure by Flash Island, filed a petition for relief under Chapter 11 of the Bankruptcy Code.[2] Since then, the debtor has continued to operate its business as a debtor in possession under successive grants of authority to use cash collateral. In its cash collateral order of April 19, 2006, the bankruptcy court established a deadline for filing certain objections to the liens of Flash Island:

> the Debtor, all creditors and all other parties in interest, shall have sixty (60) days from the entry of this Order in which to object to the nature, extent, priority and perfection of the first and second liens asserted by Flash Island against the Real Estate and Personal Property Collateral and the Cash Collateral by an objection filed in this Case

05–56003 within said time and contesting any of the same; and if no such objections are timely filed, then the assertion or filing of any such objections shall be forever barred against the Debtor, all creditors and all other parties in interest, and their successors, and assigns.

No objection to Flash Island's liens was filed.

After expiration of the time within which only the debtor could file a plan of reorganization, Flash Island filed a liquidating plan of reorganization and then, in May 2006, its First Amended Plan of Liquidation, the confirmation of which is the subject of this appeal. Under the plan, the debtor's real and personal property would be sold.[3] The plan provides that, for a period of 60 days after the effective date of confirmation, a plan trustee would manage the debtor's business and, while doing so, market and attempt to sell the real and personal property for no less than $1.7 million. To this end, the plan would permit the trustee to expend up to $9,000 of Flash Island's cash collateral for advertising and marketing costs. The plan further provides that Flash Island will be free to sell the property at foreclosure, without further order of the court, upon the earlier of (a) September 1, 2006,[4] (b) sixty days after the effective date of the plan, if the trustee reaches no sale agreement within that time, or (c) within a definite time after the trustee's timely receipt and acceptance of an offer to purchase, if the sale does not close within such time.

---

**2.** This bankruptcy case was commenced after the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 and is governed by the Bankruptcy Code as thereby amended. All references to the Bankruptcy Code are to the Code as so amended.

**3.** The debtor filed a competing plan of reorganization but later withdrew it. It has since filed another plan of reorganization, consideration of which must await the result of this appeal.

**4.** The confirmation order, issued October 23, 2006, extended this date to October 1, 2006. By a document filed in the case on October 25, 2006, Flash Island later extended this date to December 15, 2006.

Whether the property was sold by the trustee or by Flash Island, the proceeds of the sale would be distributed as follows:

- first, in payment of tax liens of the City of Portsmouth (estimated by the debtor to be $22,000);
- second, under a "carve-out" of funds otherwise payable to Flash Island on account of its secured claims:
    a.  $20,000 in payment of administrative claims of the plan trustee and his or her professionals;
    b.  $10,000 in payment of the administrative claims of the debtor's counsel and debtor's other professionals;
    c.  at least $10,000, and no more than $15,000, in payment of the claims of nonpriority unsecured creditors;
- third, and to the extent that funds remain after payment of the above claims, in payment of the two secured claims of Flash Island, to the extent of the balance due thereon less the $40,000 voluntarily paid to others from Flash Island's collateral under the previous paragraph;
- fourth, if and to the extent that funds remain after payment of the Flash Island secured claims, in payment of the secured claims of federal and state taxing authorities;
- fifth, if and to the extent that funds remain, in payment of priority claims of federal and state taxing authorities; and
- sixth, if and to the extent that funds remain, in payment of general unsecured creditors.[5]

The plan also empowers the plan trustee to prosecute any causes of action the estate may have, except those released by the plan. The net proceeds of these actions would be paid to general unsecured creditors on a pro rata basis.[6]

The plan makes no provision for payment of administrative claims in excess of those provided for under the carve-out in the second paragraph above. Neither does it ensure payment of priority tax claims; it promises to pay them only if and to the extent that proceeds are sufficient to reach the fifth level of distribution. The plan provides that confirmation of the plan would vest title to all property of the estate in the plan trustee, subject to the obligation to distribute them in accordance with the plan; the plan makes no provision for distribution of any proceeds that may remain after the payment in full of all creditors.[7] The liens of the taxing authori-

---

5.  This distribution scheme is taken from Article 4 of the plan. Article 6.5(B) includes provisions that appear to be at odds with Article 4. It specifies that after satisfaction of the claims of Flash Island, the remaining sale proceeds would be paid to the United States, in satisfaction of its tax claim. Article 6.5(B) would thus appear to contradict Article 4 with respect to the fourth, fifth, and sixth levels of distribution thereunder. The discrepancy does not affect the disposition of this appeal.

6.  The plan requires that these funds be paid to "general unsecured creditors," including any deficiency held by Flash Island. They would therefore be unavailable for distribu-

tion to administrative and priority tax claims, even if those senior claims had not already been paid in full. No one has objected to this feature of the plan.

7.  We would therefore assume that any surplus after payment of all claims in full would revert to the debtor. 11 U.S.C. § 1141(b) ("Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor."). However, the plan also provides that the interests of the debtor's equity holders would be cancelled without payment of any dividend.

ties would be avoided by entry of the confirmation order.

The plan also includes the following release of the plan proponent, Flash Island:

Proponent Release and Indemnity Covenant. In consideration of (1) the Carveout, without which no Dividends could be paid to the Unsecured Creditors holding Allowed Claims, (2) the Marketing Budget [8] and (3) the implementation of the Plan (the "Proponent Release Consideration"), the Trustee for himself and on behalf of the Debtor and the Estate (the "Releasing Trustee Parties") shall execute and deliver to the Proponent on the Effective Date a General Release discharging, releasing and relinquishing all Claims and Causes of Action which any Releasing Trustee Party has or might have against the Proponent or its participants and any of their equity holders, directors, managers, officers, employees, accountants, attorneys, consultants, and other agents (the "Released Proponent Parties").[9]

The plan empowers the plan trustee to prosecute any non-released causes of action the estate may have.

The debtor objected to the plan on several grounds, including two that are relevant to this appeal: (1) that the plan violates § 1129(a)(9) of the Bankruptcy Code by failing to provide adequately for payment of priority tax claims already due and of the substantial capital gains taxes which will likely be due upon sale of the property; and (2) that the plan's release provisions violate the requirement in § 1129(a)(3) that the plan be proposed in good faith and not by any means forbidden by law. Neither the United States nor the State of New Hampshire filed an objection to confirmation of the plan.

On July 21, 2006, the bankruptcy court held a hearing on confirmation of the plan. At the hearing, the court *sua sponte* raised the issue of whether the plan violated the absolute priority rule by paying unsecured creditors before priority tax claims where it did so only from a "carveout"; that is, only by the plan proponent's voluntary redistribution of funds that would otherwise be payable to itself. The United States voiced its concern that the plan violated the absolute priority rule by paying a dividend to unsecured creditors without first satisfying the priority tax claim of the United States. In addition, the debtor expanded on its objection to the release provision in the plan. The debtor explained that Flash Island's second mortgage can be avoided as a fraudulent transfer, because the proceeds of the note secured by the mortgage were not paid to the debtor, Whispering Pines, but to an affiliated entity known as AMI–Burlington. The debtor argued that the release, which would essentially relinquish the estate's rights, whatever they may be, to avoid a $920,000 secured claim as a fraudulent transfer, does not satisfy the requirements for plan releases of parties other than the debtor. Flash Island responded by disputing the viability of the debtor's fraudulent transfer claim, both on its merits and because the claim is time-barred, and by pointing out that the release was justified because Flash Island had given value by forbearing from fore-

---

**8.** "Marketing Budget" refers to the amount (up to $9,000) of Flash Island's cash collateral that the plan trustee is permitted to expend for advertising and marketing costs.

**9.** This release provision is set forth at Article 6.7 of the plan. Flash Island later moved to

modify the plan by deleting another release provision in the plan, set forth at section 8.3, and the court allowed that motion, but the release in Article 6.7 remains part of the plan as confirmed.

closure efforts and by proposing a plan and funding it with a carveout and with additional money for marketing efforts. The court then took the matter under advisement. No evidence was offered or received at the hearing.

In a brief filed after the confirmation hearing, the debtor expanded on its prior objection to confirmation by arguing that the plan violated the absolute priority rule by paying a dividend to unsecured creditors without first satisfying the priority tax claim of the United States.

On October 23, 2006, the court issued a memorandum opinion and a separate order confirming the plan.[10] In the memorandum, the bankruptcy court held that the United States had not filed an objection to the plan and therefore was deemed to have accepted the plan.[11] Accordingly, the court further held, it did not have to decide whether the plan violated the provisions of § 1129(b).[12] The court did not address the debtor's challenge under § 1129(a)(3) to the third-party release. Nor did the court address the debtor's argument that the plan violates § 1129(a)(9) by failing to provide adequately for payment of priority tax claims. The debtor timely appealed from the confirmation order.

## II. ARGUMENTS ON APPEAL

On appeal, the debtor challenges the confirmation order on three separate grounds.

### a. Section 1129(a)(9)

The debtor first contends that the plan cannot be confirmed because it violates § 1129(a)(9)(A), (C), and (D), which require specified treatments of certain claims unless their holders agree otherwise. Under subsection (a)(9)(A), the plan must provide that the holder of an administrative claim will be paid in full on the effective date of the plan, but the plan does not so provide, and administrative creditors did not agree to a different treatment. Subsection (a)(9)(C) requires that a plan provide for payments over time to each holder of a priority tax claim of a total value equal to the allowed amount of its claim as of the effective date of the plan, but the plan does not guarantee payment to holders of priority tax claims, and the holders of such claims did not agree to a different treatment. Subsection (a)(9)(D) requires that holders of secured tax claims that, but for the security, would constitute priority tax claims must be provided for in the same manner as mandated by subsection (a)(9)(C), but the plan does not so provide, and the United States, which

10. Inexplicably, the confirmation order recites that the holders of priority tax claims will receive on account of such claims deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of their claims. The plan does not so provide.

11. The court made no similar finding—in fact no finding at all—with respect to the priority tax claim of the State of New Hampshire, which, according to the claims register, had filed two proofs of claim in the case, both for priority taxes. The State of New Hampshire did not object to the plan.

12. The so-called "absolute priority rule" is embodied in § 1129(b) and, in relevant part,

refers specifically to subsection 1129(b)(2)(B)(ii). Subsection § 1129(b) comes into play only when a plan satisfies all the applicable requirements of subsection 1129(a) other than paragraph (8) thereof. It permits a plan proponent to obtain confirmation notwithstanding the failure to satisfy paragraph (8). Paragraph (8) requires that, "with respect to each class of claims or interests-(A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). If the United States has accepted the plan, then § 1129(b) is irrelevant. The parties do not dispute that the United States is impaired under the plan.

holds a secured tax claim to which this subsection applies, has not agreed to a different treatment. Therefore, the debtor argues, the plan does not satisfy § 1129(a)(9), and subsection 1129(a)(9) being a necessary condition of confirmation, confirmation must be denied.

Flash Island does not answer this argument on its merits but only on the basis that the debtor lacks standing to raise it. The debtor lacks standing, Flash Island contends, because the debtor is not aggrieved by the failure of the plan to satisfy section § 1129(a)(9)'s requirement that administrative and priority tax claims be paid in full. Flash Island contends that a litigant in federal court may not assert the rights of others in an effort to obtain relief from injury to themselves; a party appealing from the confirmation of a plan may challenge on appeal only those shortcomings by which it is aggrieved. According to Flash Island, § 1129(a)(9) protects the interests of administrative and tax creditors, not the debtor, and therefore the debtor lacks standing to invoke it on appeal.

### b. *Section 1129(a)(8) and the Absolute Priority Rule*

Second, the debtor argues that the court erred in ruling that § 1129(a)(8) was satisfied as to Class 4, the class of secured tax claims, of which the United States is the only member. Subsection (a)(8) was not satisfied because the United States did not and should not be deemed to have accepted the plan. Moreover, because § 1129(a)(8) was not satisfied, the plan can be confirmed only if § 1129(b) is satisfied as to the class of claims that did not accept the plan. Section 1129(b) can be satisfied as to the secured claim of the United

States only if the absolute priority rule, as codified in § 1129(b)(2)(B)(ii), is satisfied as to that class; [13] but the plan does not satisfy that rule, and therefore the plan cannot be confirmed.

Flash Island makes three arguments in response. First, it argues again that the debtor lacks standing to appeal on the basis of the rights of others, in this instance the United States. This argument is the same as Flash Island makes in opposition to the debtor's argument under § 1129(a)(9). Second, it argues that the United States at least implicitly agreed to its treatment in the plan by not objecting to the plan. Third, and in reliance on *Official Unsecured Creditors' Committee v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1308 (1st Cir.1993), it argues that, where the divergence from priority rules is limited to a secured creditor's voluntary redistribution of funds that constitute its collateral, the absolute priority rule is not violated, because the secured creditor is free to do as it pleases with its property.

### c. *Third–Party Release*

Third, the debtor argues the court erred by confirming the plan because the release of Flash Island contained in Article 6.7 of the plan violates § 1129(a)(1) (which requires, as a condition of confirmation, that the plan comply with the applicable provisions of title 11) and (a)(3) (which requires that the plan be proposed in good faith), especially where Flash Island introduced no evidence in support of the release. The debtor further argues that the release in question insulates the plan proponent even from breach of its obligations to implement the plan, and that such releases are *per se* unconscionable. Flash Island answers that the release is an implicit "settlement,"

---

**13.** The debtor does not indicate why § 1129(b)(2)(B)(ii), which by its terms applies only to classes of unsecured claims, should have any bearing on a class comprised by a secured claim.

under which Flash Island funds and implements the plan in exchange for a release of claims; that the parties agreed to proceed by offers of proof; and that Flash Island's offer of proof as to the settlement satisfied the requirement outlined in *Jeffrey v. Desmond*, 70 F.3d 183 (1st Cir.1995), by showing that the settlement does not fall below the lowest point in the range of reasonableness.

## III. JURISDICTION AND STANDARD OF REVIEW

■ A bankruptcy appellate panel is duty-bound to determine its jurisdiction before proceeding to the merits, even when jurisdiction is not raised by the litigants. *See In re George E. Bumpus, Jr. Constr. Co.*, 226 B.R. 724, 725–26 (1st Cir. BAP 1998). A bankruptcy appellate panel may hear appeals from final judgments, orders, and decrees pursuant to 28 U.S.C. § 158(a)(1). *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998). "A decision is final if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Id.* at 646 (citations omitted). An order confirming a chapter 11 plan is a final order. *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 480 (6th Cir.1992).

■ We review findings of fact for clear error and conclusions of law *de novo.* *TI Fed. Credit Union v. DelBonis*, 72 F.3d

921, 928 (1st Cir.1995); *Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.)*, 43 F.3d 714, 719 n. 8 (1st Cir.1994).

## VI. DISCUSSION

We begin with the only issue on which the debtor's standing is not in dispute: whether the plan's release of Flash Island in Article 6.7 of the plan violates § 1129(a)(1) and (3). The release, whose language is set forth above, would release any claim or cause of action that the plan trustee, the debtor, or the bankruptcy estate [14] has or may have against Flash Island or its participants and any of their equity holders, directors, managers, officers, employees, accountants, attorneys, consultants, and other agents.[15] The released claims include not only those that an affected party "has" but also those it "may have." The debtor construes this latter language as extending the release to claims that may arise after confirmation in the execution of the plan. Flash Island, the author of the release, has not disputed this interpretation, and therefore we construe the release accordingly, as extending to all claims arising after confirmation, in the execution of the plan.

The bankruptcy court made no findings or rulings on the propriety of the release.[16] Nor did Flash Island submit evidence in support of it. Flash Island contends that, with respect to litigation of this issue at

**14.** Creditors are not among the parties whose claims would be released.

**15.** Instead of merely providing that the claims in issue shall be deemed released, paragraph 6.7 of the plan provides that "the Trustee for himself and on behalf of the Debtor and the Estate (the 'Releasing Trustee Parties') shall execute and deliver to the Proponent on the Effective Date a General Release[.]" Insofar as the plan trustee would have no discretion in the matter, we construe his or her role in

executing and delivering the release as strictly ministerial. The giving of the release is in no sense a discretionary act of the plan trustee but a necessary consequence of the plan's confirmation.

**16.** There is no evidence to support Flash Island's contention that "[t]he bankruptcy court determined by judicial notice that the 'release' satisfied the *Jeffrey* standard," referring to the standard for approval of compromises in *Jeffrey v. Desmond.*

the confirmation hearing, the parties agreed to proceed by offers of proof, presumably in lieu of actual proof by evidence. Flash Island has cited no evidence of any such agreement in the record, nor have we found any. We conclude that there was no such agreement. Moreover, Flash Island made no offer of proof as to the release issue.

Flash Island urges the panel to treat this release as part of an implicit "settlement" under which claims against Flash Island are released in exchange for Flash Island's contributions to the funding and execution of the liquidating plan. Flash Island further argues that the release should be approved if the compromise as a whole satisfies the requirements for approval of compromises that were articulated in *Jeffrey v. Desmond*, 70 F.3d at 183. In *Jeffrey*, the court of appeals reviewed and affirmed an order granting a motion by the chapter 7 trustee under Fed. R. Bankr.P. 9019(a) to approve a compromise he had entered into on behalf of the bankruptcy estate.

The debtor urges a more stringent standard of review. It argues that when a plan releases an estate's claims against a third party, the court must determine whether the compromise is fair and equitable and would otherwise meet the standards for approval outside a plan. The debtor adds that the court should consider five additional factors to assess the fairness of the compromise: (1) whether there is an identity of interest between the debtor and released party such that a suit against the released party will deplete the estate's resources; (2) whether the released party has made a substantial contribution to the plan; (3) the necessity of the release to the reorganization; (4) whether

creditors and interest holders have overwhelming accepted the plan and release; and (5) whether the plan pays all or substantially all of the claims of the creditors and interest holders under the plan. *In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr.D.Del.2004) (citing *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr.W.D.Mo.1994)).

The debtor further argues that where the release insulates the plan proponent from a breach of the plan itself, the clause is unconscionable and must not be approved. Flash Island does not answer this argument.

The panel views the release as two distinct releases rolled into one: a "settlement or adjustment of claims belonging to the debtor and the estate" within the meaning of § 1123(b)(3)(A); and a release (or limitation of liability, or grant of immunity) of a party responsible for implementing the plan. Each must be considered on its own.

#### a. Release of Claims of Estate and Debtor

The release would settle any claim of the debtor or the estate against Flash Island, including whatever cause of action the debtor may have to avoid Flash Island's second mortgage and the debt it secures. A chapter 11 plan "may provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate." 11 U.S.C. § 1123(b)(3)(A). Accordingly, the court's authority, in the sense of subject-matter jurisdiction, to approve such a release is not in question.[17] The only issue here is whether the plan proponent satisfied its burden of justifying the release at the confirmation hearing.

17. This is not an instance in which the release would bind creditors and prohibit them from suing third-parties. Several courts of appeal have ruled that a bankruptcy court lacks authority to approve releases of that nature.

The standard governing approval of such releases in a plan of reorganization has not been established in this circuit.

■ Flash Island urges the panel to apply the same standard as is applied for approval of compromises outside of a plan, as articulated in *Jeffrey v. Desmond*, 70 F.3d at 185. While the *Jeffrey* standard may be a useful starting point, we note that the *Jeffrey* standard is structured to accord deference to a trustee's judgment by reviewing that judgment only for abuse of discretion. *Hill v. Burdick (In re Moorhead Corp.)*, 208 B.R. 87, 89 (1st Cir. BAP 1997) ("The judge, however, is not to substitute her judgment for that of the trustee, and the trustee's judgment is to be accorded some deference."), *aff'd*, 201 F.3d 428 (1st Cir.1998); *In re 110 Beaver Street Partnership*, 244 B.R. 185, 187 (Bankr.D.Mass.2000) ("[T]he Court will defer to the trustee's judgment and approve the compromise, provided the trustee demonstrates that the proposed compromise falls within the 'range of reasonableness' and thus is not an abuse of his or her discretion."). Where, as here, the "settlement" is not put forth by a fiduciary having authority and responsibility to act for the estate and who negotiated it in an arm's length transaction, but unilaterally by the very party who would be receiving the benefit of the release, there is no cause for deference in the matter. Therefore, without modification, the *Jeffrey* standard is not sufficiently protective of the estate and the debtor.

Apart from that observation, we are not well positioned to opine on the parameters of the correct standard. The bankruptcy court received no evidence and made neither findings nor rulings on the issue. We lack findings of fact on the matter and cannot possibly affirm, regardless of the standard, there having been no determination that any standard was satisfied.

Therefore, if reversal were not required on other grounds, we would at least be required to vacate the confirmation order and remand to the bankruptcy court for an evidentiary hearing and entry of findings and rulings on the propriety of the release as a settlement of claims against Flash Island.

**b.** ***Release of a Party Responsible for Implementing the Plan***

■ As a grant of immunity to a party responsible for implementing the plan, the release is overbroad and impermissible. Under the plan, if the plan trustee were unable to sell the property within a limited time, Flash Island would become responsible for liquidating the debtor's assets and, at least to that extent, for implementing the plan. The release would insulate Flash Island from suit by the debtor or the plan trustee for breach of the terms of the plan and for negligence or malfeasance in its implementation; the release being categorical, even gross negligence and willful misconduct would be inactionable. A provision of this kind renders a plan unenforceable. We agree with those courts who have held that a release of this breadth is inconsistent with the requirements of the Bankruptcy Code and precludes confirmation of a plan. *In re Hoffinger Indus., Inc.*, 321 B.R. 498, 513 (Bankr.E.D.Ark.2005) (a provision insulating a reorganized debtor from liability for simple breach of the plan deemed unconscionable; "a confirmed plan should be enforceable and amenable to damages between contractually bound parties"); *In re WCI Cable, Inc.*, 282 B.R. 457, 478–80 (Bankr.D.Or.2002) (provision purporting to exculpate debtors' officers, directors, employees and agents, including professionals, from liability for their postpetition acts, except for willful misconduct or gross negligence, was inconsistent with require-

ments of the Bankruptcy Code and precluded confirmation of plan unless amended to include acts of negligence and of fiduciary breach). We therefore **REVERSE** the order of confirmation.[18]

ROSENTHAL, U.S. Bankruptcy Appellate Panel Judge, concurring in the result.

I concur with the majority's ruling that the confirmation order must be reversed as the plan provides an overly broad release. I, however, would hold that the debtor, who properly raised in its objection and preserved on appeal the issue of whether the plan violated that absolute priority rule codified in 11 U.S.C. § 1129(b)(2)(B), has standing to appeal that issue. I would adopt the analysis of *Official Unsecured Creditors' Committee v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305 (1st Cir.1993); *In re MCorp. Fin., Inc.*, 160 B.R. 941 (S.D.Tex.1993); and *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr.D.Del.2001), set forth in *In re Armstrong World Industries, Inc.*, 320 B.R. 523 (D.Del.), *aff'd*, 432 F.3d 507 (3d Cir.2005). I agree with the Third Circuit's statement that "these cases ... do not stand for the unconditional proposition that creditors are generally free to do whatever they wish with the bankruptcy proceeds they receive. Creditors must also be guided by the statutory prohibitions of the absolute priority rule, as codified in 11 U.S.C. § 1129(b)(2)(B)." Thus I would also reverse the confirmation order on the ground that the plan violated the absolute priority rule.

---

18. In view of this holding, we need not consider the debtor's other arguments on appeal and the debtor's standing to make them.