# United States Court of Appeals
## For the First Circuit

No. 10-2284

IN RE AMERICAN CARTAGE, INC.,

Debtor.

————————————————

CITY SANITATION, LLC,

Appellant,

v.

ALLIED WASTE SERVICES OF MASSACHUSETTS, LLC, ET AL.,

Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Howard, Selya and Thompson,
Circuit Judges.

Marshall F. Newman, with whom Newman & Newman, P.C. was on brief, for appellant.
Euripides Dalmanieras and John A. Burdick, Jr., with whom Kenneth S. Leonetti, Foley Hoag LLP, D. Ethan Jeffery, and Murphy & King, P.C. were on consolidated brief, for appellees.

August 31, 2011

**SELYA**, **Circuit Judge**.  This appeal is the culmination of a pitched battle between two waste-disposal firms, squabbling over the carcass of a third.  The littered battlefield brings to mind the familiar adage that one man's trash is another man's treasure.

Telling the tale requires us to resolve questions of standing to prosecute claims arising out of a bankruptcy; questions of first impression as to the distinction between "commercial tort claims" and "proceeds" and as to the force and effect of Bankruptcy Rule 8006; and a question anent the fairness of a negotiated settlement.  After careful consideration, we conclude that the disputed claims are commercial tort claims; that the trustee in bankruptcy had exclusive standing to pursue and settle those claims; that the appellant, by failing to comply with Bankruptcy Rule 8006, waived its theory of abandonment; and that the bankruptcy court's approval of the proposed settlement was within the realm of its discretion.  Accordingly, we affirm the judgment below.

## I.  BACKGROUND

This case arises out of the ashes of American Cartage, Inc., a waste-disposal firm.  During its halcyon days, American Cartage borrowed money from Financial Federal Credit, Inc. (FFC) to finance its operations and defray the cost of acquiring needed equipment.  In return, it gave FFC promissory notes and a security

interest in the purchased equipment (the Equipment Collateral).

The security interest extended to

> all goods, inventory, equipment, accounts, accounts receivable, chattel paper, documents, instruments, contract rights, general intangibles, investment property, securities entitlements, deposit accounts, fixtures and other property, wherever located, now or hereafter belonging to [American Cartage] . . . and in all proceeds, insurance proceeds, substitutions, replacement parts, additions and accessions of and/or to all of the foregoing.

On July 23, 2003, American Cartage filed a voluntary bankruptcy petition under Chapter 11, see 11 U.S.C. § 301, and moved for leave to continue business operations during the reorganization period. The bankruptcy court granted replacement liens for the secured creditors (including FFC) and allowed the debtor to use a specified amount of cash collateral for payroll and other post-petition expenses.

Within two weeks, the United States Trustee filed an emergency motion seeking either to dismiss the case or to convert it to a straight Chapter 7 bankruptcy. See id. §§ 701-727. This motion was sparked by the debtor's failure to obtain commercial liability insurance covering its ongoing operations. The bankruptcy court responded by directing that a Chapter 11 trustee assume responsibility for the debtor's affairs. Soon thereafter, the court approved the appointment of John Burdick as trustee.

Up to this point, William Zoll had managed the debtor's day-to-day operations. The trustee sought and received the court's blessing to retain Zoll as a consultant. With Zoll's help, the trustee continued to run the business while attempting to construct a viable reorganization plan.

By January of 2005, the trustee had despaired of any reorganization and moved to convert the proceeding to a Chapter 7 liquidation. Zoll, with the trustee's assent, engaged Allied Waste Services of Massachusetts, LLC (Allied) to service the debtor's remaining customers during the wind-up period.

Faced with this new reality, FFC sought relief from the automatic stay, id. § 362, in order to take possession of the Equipment Collateral, including garbage trucks and industrial-sized trash containers. FFC wanted to sell this equipment to a rival trash hauler. The trustee did not oppose FFC's motion.

On February 7, 2005, the bankruptcy court converted the proceeding, assured continuity by appointing Burdick as the Chapter 7 trustee, lifted the automatic stay to the extent requested, and ordered the debtor to turn over the Equipment Collateral to FFC. With no further business to be done, the trustee terminated Zoll's contract. Zoll subsequently obtained employment with Allied.

Approximately one month later, FFC again moved for relief from the automatic stay. This time, it sought to take possession of, and sell, the remaining assets in which it held a security

interest (the Other Collateral). FFC represented that it had found a buyer willing to pay $142,500 for the Equipment Collateral and the Other Collateral as a package. The trustee assented to the motion on the condition that the bankruptcy estate receive a $12,500 carve-out for administrative expenses. FFC agreed, and the bankruptcy court granted the motion, entering a form of order prepared by FFC.

FFC foreclosed on the assets and sold them to Todesca Equipment Company, which resold them to the appellant, City Sanitation, LLC (City).

In February of 2007, City filed a state court action against Allied and Zoll. Posturing itself as the debtor's successor in interest, it alleged that Zoll, while working for the debtor and acting in concert with Allied, had converted assets, interfered with contractual relationships, breached fiduciary duties, and conspired to commit these acts.[1] Although those claims were lodged against both Allied and Zoll, for ease in exposition we refer to them as claims against Allied.

A series of procedural maneuvers followed, but none of them is relevant here. What matters is that the trustee, unaware of the pendency of the state court action, filed his final report, and the bankruptcy court — equally unaware of the state court

_____

[1] City further alleged that Zoll and Allied had violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968. This claim is not at issue here.

action — closed the bankruptcy case. It was not until some eighteen months later that Allied brought the state court action to the trustee's attention. At that juncture, the trustee moved to reopen the bankruptcy case.

The bankruptcy court granted the motion and, over City's strenuous objection, authorized the trustee to take over the claims against Allied. The court reasoned that the claims were commercial tort claims, that they belonged to the estate, and that the trustee had exclusive standing to pursue them. In re Am. Cartage, Inc., No. 03-44308, 2009 WL 4780972, at *4-6 (Bankr. D. Mass. Dec. 11, 2009). With City continuing to object, the court then approved the trustee's proposal to settle the claims for $12,000. Id. at *7-8.

City took a first-tier appeal to the district court, which affirmed the bankruptcy court's orders. See City Sanit., LLC v. Burdick (In re Am. Cartage, Inc.), 438 B.R. 1 (D. Mass. 2010). This timely appeal ensued.

## II.  ANALYSIS

In bankruptcy cases, Congress has fashioned a two-tiered framework for appellate review as of right. Under this framework, litigants in the ordinary case must first appeal to the district court (or, in some circuits, a bankruptcy appellate panel). See 28 U.S.C. § 158(a)-(b); Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.), 132 F.3d 104, 107 (1st Cir. 1997). The courts of appeals are then available as a second tier of

appellate review.  See 28 U.S.C. § 158(d)(1); Stornawaye Fin. Corp. v. Hill (In re Hill), 562 F.3d 29, 32 (1st Cir. 2009).  Despite this sequencing, we cede no special deference to the determinations made by the first-tier tribunal (whether a district court or a bankruptcy appellate panel), but assess the bankruptcy court's decision directly.  Gannett v. Carp (In re Carp), 340 F.3d 15, 21 (1st Cir. 2003).  In that process, we review findings of fact for clear error and conclusions of law de novo.  Groman v. Watman (In re Watman), 301 F.3d 3, 7 (1st Cir. 2002).

In this second-tier appeal, City asseverates that it had standing to prosecute the claims against Allied and that, in all events, the settlement negotiated by the trustee should have been rejected.  We address these contentions separately.

## A.  **The Disputed Claims**.

City argues that the claims against Allied are proceeds of the collateral that it acquired from FFC (through Todesca) and that, therefore, it has standing to pursue those claims.  Allied asserts that the disputed claims are commercial tort claims, not proceeds, and as such, are not covered by FFC's security interest. We look to state law to resolve this issue.

"Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation."  Shamus Holdings, LLC v. LBM Fin., LLC (In re Shamus Holdings, LLC), 642 F.3d 263, 267 (1st Cir. 2011) (quoting Raleigh

v. Ill. Dep't of Rev., 530 U.S. 15, 20 (2000)). Here, the underlying substantive law is the law of Massachusetts, a jurisdiction in which secured transactions are governed by a state-specific iteration of Article 9 of the Uniform Commercial Code (UCC). See Mass. Gen. Laws ch. 106, §§ 9-101 to 9-709. It is uncontradicted that, in this case, the debtor gave FFC a security interest in many of its assets. The question, then, is whether the claims asserted against Allied were caught up within the sweep of this security interest.

By its terms, Article 9 applies to transactions that "create[] a security interest in personal property or fixtures by contract" and to sales of "accounts, chattel paper, payment intangibles, or promissory notes." Id. § 9-109(a)(1), (3). But this article does not apply to "an assignment of a claim arising in tort, other than a commercial tort claim." Id. § 9-109(d)(12). A commercial tort claim is defined in relevant part as a "claim arising in tort with respect to which[] the claimant is an organization." Id. § 9-102(a)(13). Since all of the potential claimants — the debtor, FFC, Todesca, and City — are organizations, we will not dwell upon that aspect of the definition. See 4 James J. White & Robert S. Summers, Uniform Commercial Code § 30-10, at 81 (6th ed. 2010).

Here, the asserted claims are claims for conversion, interference with contractual relations, breach of fiduciary duty,

-8-

and civil conspiracy. Each of them sounds in tort. See, e.g., City Sanit. LLC v. Beck, 947 N.E.2d 1152 (Mass. App. Ct. 2011) (table) (conversion); Cachopa v. Town of Stoughton, 893 N.E.2d 407, 409 n.3 (Mass. App. Ct. 2008) (interference with contractual relations); Doe v. Harbor Sch., Inc., 843 N.E.2d 1058, 1065-66 (Mass. 2006) (breach of fiduciary duty); Kyte v. Philip Morris Inc., 556 N.E.2d 1025, 1027 (Mass. 1990) (civil conspiracy); see also Restatement (Second) of Torts §§ 222A, 766, 874, 876. Thus, the claims fall squarely within the UCC's definition of commercial tort claims.

Under Massachusetts law, commercial tort claims must be described with specificity in a security agreement in order to be considered part of that agreement. Mass. Gen. Laws ch. 106, § 9-108(e)(1). This requirement places commercial tort claims in stark contrast to other kinds of collateral, which may be defined broadly by type as long as the description, even if not specific, "reasonably identifies what is described." Id. § 9-108(a). Furthermore, an after-acquired property clause in a security agreement cannot create a security interest in a commercial tort claim. Id. § 9-204(b)(2). The claim must already exist when the parties enter into the security agreement. See id. cmt. 4; see also id. § 9-108 cmt. 5.

The security agreement here did not specifically mention any claims against Allied. Moreover, no such claims existed when

-9-

the security agreement was signed (indeed, Allied had not then appeared on the scene). It is, therefore, plain that these commercial tort claims were not transferred by foreclosing pursuant to the security agreement. Rather, those claims remain the property of the estate, and the trustee is the proper party to prosecute them. See 11 U.S.C. § 323(b); see, e.g., In re Kane, 628 F.3d 631, 637 (3d Cir. 2010); Moses v. Howard Univ. Hosp., 606 F.3d 789, 795 (D.C. Cir. 2010).

City tries to avoid the force of this reasoning by characterizing the claims as proceeds of collateral. This argument presents an issue of first impression in this circuit. The question is whether the right to pursue a commercial tort claim can be passed to a secured creditor as proceeds of original collateral. We conclude that it cannot.

Proceeds are defined in relevant part as "rights arising out of collateral [and,] to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral." Mass. Gen. Laws ch. 106, § 9-102(a)(64)(C)-(D). City argues that FFC's security interest (to which it has succeeded) confers upon it the right to prosecute claims arising from interference with the collateral. But we interpret the UCC and the case law to mean that the term "proceeds" refers to the secured

-10-

creditor's right to value derived from the collateral, not to the mere act of attempting to recover that value.

Of course, the UCC states that "[a] security interest in a tort claim . . . may exist under this Article if the claim is proceeds of other collateral." U.C.C. § 9-102 cmt. 5(g). But this comment must be read in light of the UCC's statement that it is a right to payment from the resolution of a tort claim, and not the claim itself, that may constitute proceeds of collateral. "[Article 9] . . . applies to assignments of 'commercial tort claims' . . . as well as to security interests in tort claims that constitute proceeds of other collateral (e.g., a right to payment for negligent destruction of the debtor's inventory)." Id. § 9-109 cmt. 15 (emphasis added). Viewed as a whole, Article 9 teaches that when a party has an interest in a commercial tort claim as proceeds, what the secured party has is a right to the recovery, not a right to the claim itself. An action for conversion is not proceeds; only the end product of that action — the settlement amount or award — constitutes proceeds.

The case law cited by City is unpersuasive. Those cases stand only for the proposition that money received from the settlement of, or judgment on, a tort claim can be proceeds of the collateral harmed. Thus, "[t]he usual proceeds of collateral are the money obtained from selling it [or] money obtained in compensation for a diminution in [its] value." Helms v. Certified

-11-

Packaging Corp., 551 F.3d 675, 678 (7th Cir. 2008); see McGonigle v. Combs, 968 F.2d 810, 828 (9th Cir. 1992) (stating that proceeds arise out of "[t]he classic situation . . . of a tort recovery obtained by a debtor for damage to secured property"). These cases speak of claims that already have been brought to fruition and resulted in recoveries. Contrary to City's importunings, these cases do not support the notion that a secured party acquires the right to prosecute the debtor's commercial tort claims as proceeds, as opposed to acquiring the right to a payment compensating for harm to its collateral.

To cinch matters, treating commercial tort claims themselves as proceeds would blur any meaningful distinction between the two categories. We do not believe that either the Massachusetts legislature or the drafters of the UCC had such an obscuration in mind. Cf. Local 589, Amalg'd Transit Union v. MBTA, 491 N.E.2d 1053, 1057 (Mass. 1986) (explaining that the adoption of such a definition would "creat[e] an exception capable of swallowing the rule" (citation omitted)). Unliquidated claims of an organization alleging tortiously inflicted harm are properly classified as commercial tort claims. The claims asserted against Allied are commercial tort claims, not proceeds.

City has a laundry list of related arguments. We can dispose summarily of the first item on this list: City's suggestion that the trustee's agreement to provide FFC with relief from the

automatic stay and the bankruptcy court's ensuing order gave FFC a security interest in the claims against Allied. The replacement liens never specifically described any claims against Allied, so they could not have transferred an interest in such claims to FFC. See Mass. Gen. Laws ch. 106 § 9-108(e)(1).

City's allusion to the form of order prepared by FFC in connection with the lifting of the automatic stay gains it no traction. This order, entered by the bankruptcy court, listed among other items of collateral "trade names, service names, service marks, telephone numbers, choses in action [and] vehicles." City posits that the inclusion of "choses in action" somehow transferred any claims that the debtor might have had notwithstanding the fact that the debtor never granted a security interest in "choses in action" to FFC. This premise is hopeless. Massachusetts law holds that "in the absence of statutory restrictions, the rights of the parties to secured transactions are controlled by the agreement between them," Mechs. Nat'l Bank of Worcester v. Killeen, 384 N.E.2d 1231, 1236 (Mass. 1979), and as the security agreement here did not include an interest in "choses in action," we will not expand the parties' rights under that agreement to include such an interest.

City's next argument requires more discussion. It says that Allied harmed its collateral as opposed to harming the assets

-13-

of the bankruptcy estate, so that it has standing to pursue the disputed claims.  This argument puts the cart before the horse.

It is common ground that when a cause of action belongs to the bankruptcy estate, the trustee has the exclusive right to assert it.  Honigman v. Comerica Bank (In re Van Dresser Corp.), 128 F.3d 945, 947 (6th Cir. 1997); Koch Ref. v. Farmers Union Cent. Exch., Inc., 831 F.2d 1339, 1342 (7th Cir. 1987).  Conversely, the trustee lacks standing to pursue claims that belong personally to the creditors.  Stevenson v. J.C. Bradford & Co. (In re Cannon), 277 F.3d 838, 853 (6th Cir. 2002); Koch Ref., 831 F.2d at 1348-49.  A court tasked with determining who can pursue a particular claim must look to the kind of harm alleged.

If the claim is a general one, it is property of the estate.  See Koch Ref., 831 F.2d at 1348-49 (claim is general if "the liability is to all creditors of the corporation").  Put another way, when the alleged injury to a creditor is indirect or derives solely from an injury to the debtor, the claim is general. Schertz-Cibolo-Univl. City, Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Trust), 25 F.3d 1281, 1284 (5th Cir. 1994). Claims are deemed personal, rather than general, when a creditor "himself is harmed and no other claimant or creditor has an interest in the cause." Koch Ref., 831 F.2d at 1348.  A trustee in bankruptcy has no standing to prosecute such a personal claim.  In re Cannon, 277 F.3d at 853-54.

In this instance, the claimed wrongdoing supposedly occurred while Zoll was still in the debtor's employ. His acts (if they occurred at all) took place well before FFC gained possession of its collateral. Any wrong committed would, therefore, have been directly adverse to the debtor's interests and would have diminished its estate generally. See Highland Capital Mgmt., L.P. v. Welsh, Carson, Anderson & Stowe, VI, L.P. (In re Bridge Info. Sys., Inc.), 344 B.R. 587, 594-95 (E.D. Mo. 2006); In re Eagle Enters., Inc., 265 B.R. 671, 678 (E.D. Pa. 2001). Consequently, the harm was to the debtor, and these claims must be considered part of the debtor's estate.

This point is reinforced by an examination of the state court complaint, which only describes harm inflicted upon the debtor, its customers, and its assets. As to City, the harm alleged is derivative and indirect.

The short of it is that FFC (in whose shoes City stands) is no different from any other creditor of the debtor with respect to the asserted claims. If Allied, with Zoll's connivance, misappropriated the debtor's assets, the trustee is the proper party to assert those claims. See Koch Ref., 831 F.2d at 1342-43.

In an effort to change the trajectory of the debate, City falls back on the venerable tenet that any property not administered when a bankruptcy case is closed is deemed abandoned. See 11 U.S.C. § 554(c). Based on that tenet, it posits that it

-15-

owns the claims against Allied because the trustee abandoned them. The district court did not reach the merits of this argument, nor do we.

Bankruptcy Rule 8006 requires that a first-tier appeal include "a statement of the issues to be presented." Several courts have held that a party's failure to include a particular issue in such a statement means — at least in the absence of exceptional circumstances — that the issue is waived. See, e.g., Zimmermann v. Jenkins (In re GGM, P.C.), 165 F.3d 1026, 1032 (5th Cir. 1999); Snap-On Tools, Inc. v. Freeman (In re Freeman), 956 F.2d 252, 255 (11th Cir. 1992). We have heretofore avoided ruling on this point. See Yacovi v. Rubin and Rudman, L.L.P. (In re Yacovi), 411 F. App'x 342, 348 (1st Cir. 2011). This case presents the question head-on.

While we are aware of the existence of some authority to the contrary, see, e.g., Office of the U.S. Tr. v. Hayes (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.), 104 F.3d 1147, 1148 (9th Cir. 1997) (per curiam), we believe that the rationale behind the waiver rule is sound. Cf. Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962, 964-65 (1st Cir. 1997) (concluding that plaintiff who did not seek district court review of magistrate judge's ruling waived the right to challenge that ruling on appeal). Rules are essential for the orderly processing of litigation, and a party's disregard of a rule, without good

cause, ought not to be condoned. We therefore hold that at least where, as here, there are no exceptional circumstances, failure to comply with Rule 8006 waives the omitted issue on appeal.

This does not mean, of course, that the list of issues must be precise to the point of pedantry. An issue that is not specifically enumerated may be deemed preserved if the substance of the issue reasonably can be inferred from an issue or issues that are listed. See In re Freeman, 956 F.2d at 255. Here, however, the abandonment issue is both legally and factually distinct from the issues that City articulated in its Rule 8006 statement.

We need not tarry. The district court carefully examined City's Rule 8006 statement and cogently explained why the omitted argument could not be inferred from any argument identified therein. See City Sanit., 438 B.R. at 8-10. It would serve no useful purpose to rehearse that exercise here. The bottom line is that, in the circumstances of this case, City's noncompliance with Rule 8006 resulted in a waiver of its afterthought abandonment argument.

That ends this aspect of the appeal. For the reasons stated, we conclude that the claims against Allied were commercial tort claims; that those claims remained property of the debtor's estate; and that the trustee had exclusive standing to assert them.

### B.  **Approval of the Settlement**.

Our conclusion that the trustee had exclusive standing to maintain the disputed claims brings us to City's back-up argument: that the bankruptcy court abused its discretion when it approved the trustee's proposed settlement of those claims.[2]

Bankruptcy court approval of a negotiated settlement engenders deferential review.  The authority to approve or disapprove a settlement lies within the sound discretion of the bankruptcy court, and we will overturn the exercise of that discretion only upon a showing of abuse.  See, e.g., Ars Brook, LLC v. Jalbert (In re Servisense.com, Inc.), 382 F.3d 68, 71 (1st Cir. 2004).  In such situations, appellate review operates with the background understanding that settlements are looked upon with favor in bankruptcy proceedings.  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.), 136 F.3d 45, 50 n.5 (1st Cir. 1998).  The task of both the bankruptcy court and any reviewing court is "to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."  Cosoff v. Rodman (In re W.T. Grant Co.),

---

[2] We have some doubt as to whether City has standing to raise this ground of appeal.  See Spenlinhauer v. O'Donnell, 261 F.3d 113, 117-18 (1st Cir. 2001) (noting limitations on appellate standing in bankruptcy).  Because the merits of City's plaint are easily resolved, we assume arguendo that City has standing.

699 F.2d 599, 608 (2d Cir. 1983) (alterations, internal quotation marks, and citation omitted).

The trustee plays a special role in the approval process because he is the person "entrusted to marshal an estate's assets and liabilities, and proceed in settling its accounts on whatever grounds he, in his informed discretion, believes will net the maximum return for the creditors (on whose behalf he toils)." LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 212 F.3d 632, 635 (1st Cir. 2000). If a trustee chooses to accept a less munificent sum for a good reason (say, to avoid potentially costly litigation), his judgment is entitled to some deference. See Kowal v. Malkemus (In re Thompson), 965 F.2d 1136, 1145 (1st Cir. 1992). Nevertheless, a bankruptcy court cannot blindly take the trustee's word that a settlement is fair and reasonable. It "must apprise [it]self of all facts necessary to evaluate the settlement and make an 'informed and independent judgment.'" LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.), 841 F.2d 159, 162 (7th Cir. 1987) (quoting TMT Trailer Ferry, 390 U.S. at 424); see In re Mailman Steam Carpet Cleaning, 212 F.3d at 635.

In considering the reasonableness of a proposed settlement, a bankruptcy court's decisional calculus typically is informed by the Jeffrey factors:

> (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of

-19-

> the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.

Jeffrey v. Desmond, 70 F.3d 183, 185 (1st Cir. 1995); see TMT Trailer Ferry, 390 U.S. at 424 (enumerating a similar mix of factors as "relevant to a full and fair assessment of the wisdom of the proposed compromise"). In the case at hand, City strives to convince us that all the Jeffrey factors favor it and that the bankruptcy court miscalibrated the scales. We are not persuaded.

City insists that collecting a judgment from Allied, a publicly traded company, would be child's play. Even so, this consideration is outweighed by the three remaining Jeffrey factors.

We start with the probability of success, which the bankruptcy court concluded was low. In re Am. Cartage, 2009 WL 4780972, at *7. This conclusion is supported by the fact that the trustee (a person intimately familiar with the debtor's internal operations) thought that the claims were groundless. See In re Thompson, 965 F.2d at 1145 (crediting trustee's representation regarding merits of litigation). It is also supported by the fact that the trustee hired Allied and introduced Allied to the debtor's customers in order to curtail serial breaches of the debtor's existing contracts. The debtor's failure to obtain liability insurance (thus jeopardizing the bankruptcy estate) lends credence to the notion that the debtor was incapable of servicing its

customers by itself. Allied's non-culpable involvement with the debtor's customers was, thus, fully explained, and the bankruptcy court appears carefully to have weighed this explanation.

The third Jeffrey factor also cuts in favor of approval. The convoluted nature of the state court action, which featured multiple claims involving third parties and a tangled procedural posture, sounds an aposematic note. If the trustee were to pursue the claims, he would be obliged to expend substantial resources on discovery, motion practice, and trial, without a high likelihood of success. Because the estate had been closed, there were no funds available to underwrite such costs. In these straitened circumstances, we cannot second-guess the bankruptcy court's inference that continued litigation would bring with it too high a level of expense and delay. See In re Servisense.com, 382 F.3d at 75-76; In re Dennett, 449 B.R. 139, 145-46 (Bankr. D. Utah 2011).

Finally, the bankruptcy court appropriately took into account the paramount interest of the creditors. Settling quickly for $12,000 allowed the trustee to distribute something to creditors. In bankruptcy, as in life, half a loaf is sometimes better than none.

City takes umbrage with the fact that it was never consulted about the probability of success in the state court action. But City points to no requirement that a trustee must consult a potential creditor before settling a general claim, and

-21-

we do not think that any such requirement existed here.  Cf. Whispering Pines Estates, Inc. v. Flash Island, Inc. (In re Whispering Pines Estates, Inc.), 370 B.R. 452, 461 (B.A.P. 1st Cir. 2007) (finding no reason to defer to party proposing settlement simply because it stood to benefit from proposal).

City also suggests that the trustee neglected to apprise the bankruptcy court of all the material facts.  But despite the sound and fury in which this suggestion is couched, City never identifies any material information that the trustee withheld from the bankruptcy court.

In the last analysis, "many, if not most, claims settled in bankruptcy proceedings are not amenable either to ready or exact valuation."  Hicks, 136 F.3d at 51.  In this case, the bankruptcy court made a thorough examination into the bona fides of the proposed settlement and the attendant risk-reward ratio.  It sensibly concluded that the recommended settlement fell within the range of reasonableness.  In light of the totality of the circumstances, we conclude, without serious question, that the approval of the settlement was within the bankruptcy court's wide discretion.  See, e.g., Jeremiah v. Richardson, 148 F.3d 17, 22 (1st Cir. 1998) (affirming settlement when lower court "patiently informed itself of the relevant facts, and carefully exercised independent judgment").

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we reject City's appeal.

**Affirmed**.