
**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>SKYLINE RIDGE, LLC,<br>               Debtor. | BAP Nos. AZ-20-1264-BTL<br>AZ-21-1000-BTL<br>(Related Appeals) |
| SKYLINE RIDGE, LLC; AHMAD ZARIFI,<br>              Appellants,<br>v.<br>CINCO SOLDADOS, LLC; SAMUEL<br>ZARIFI; EARTH'S HEALING, INC.; VICKI<br>PUCHI-SAAVEDRA; EDUARDO<br>SAAVEDRA; DAVID PARRI; RALLIS<br>CREDITOR GROUP; FOTINOS<br>PROPERTIES, LLC; TRUDY NOWAK,<br>Chapter 7 Trustee of Estate of RL<br>Ventures; WILLPOWER PROPERTIES,<br>LLC; AHMAD ZARIFI,<br>              Appellees. | Bk. No.  4:18-bk-01908-BWM<br><br>**MEMORANDUM**[*] |

Appeal from the United States Bankruptcy Court
for the District of Arizona
Brenda Moody Whinery, Bankruptcy Judge, Presiding

Before: BRAND, TAYLOR, and LAFFERTY, Bankruptcy Judges.

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

## INTRODUCTION

Chapter 11[1] debtor Skyline Ridge, LLC ("Debtor") and Debtor's principal, Ahmad Zarifi, appeal an order denying confirmation of Debtor's proposed chapter 11 plan and confirming the plan proposed by creditor Cinco Soldados, LLC ("Cinco"), as well as the court's prior rulings with respect to the parties' competing plans. Seeing no reversible error by the bankruptcy court, we AFFIRM.

## FACTS

### A.    Background of the parties

Debtor is an Arizona limited liability company formed in 1994 by Zarifi, its sole member and manager. Zarifi is a civil engineer, home designer, and builder. Zarifi formed Debtor for the purpose of designing, building, and selling homes in the Tucson area.

Cinco is an Arizona limited liability company formed in 2006 by Zarifi and four other members, including Chris Sheafe and Michael Carlier. Sheafe, Cinco's manager, is a developer of residential and commercial property. Carlier is a real estate broker. Zarifi and Sheafe did not know each other prior to forming Cinco.

Cinco was formed for the purpose of acquiring and developing a 160-acre parcel of land known as Rancho Soldados ("Cinco Property"). The Cinco Property was purchased for $11 million. It was funded by a $6 million loan

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

from Alliance Bank ("Bank Loan") secured by a first-position deed of trust on the Cinco Property, a $4 million loan from Debtor ("Skyline Loan") secured by a second-position deed of trust on the Cinco Property ("Skyline DOT"), and $1 million in cash contributions from Cinco's members. Zarifi's share of the initial cash contribution was $250,000. The Skyline Loan was subordinate to and "on the same terms as" the Bank Loan.

Per Cinco's Operating Agreement, the members provided personal guaranties of the Bank Loan. Each Cinco member was responsible for making his respective share of the Bank Loan payments. Cinco's members also executed personal guaranties of the Skyline Loan, which were to "terminate automatically" upon an event to be set forth in the loan agreement. Like the Bank Loan, each Cinco member was obligated to make his respective share of the Skyline Loan payments.

The documents relevant to the Skyline Loan include the Skyline Loan Agreement, the Skyline Note, the Skyline DOT, and the (later) Skyline Note Amendment. The Skyline Note provided for the payment of interest and default interest and had a maturity date of July 21, 2008. Both the Skyline Loan Agreement and the Skyline Note provided that no provision of either document could be changed, discharged, terminated or waived except in a signed writing.

Cinco's members agreed that $4 million of Zarifi's equity contribution to Cinco would be in the form of the Skyline Note secured by the Skyline DOT on the Cinco Property. Sheafe and Carlier testified that they understood Zarifi

3

would convert the Skyline Note into equity when the Cinco Property was platted. None of the Skyline Loan documents refers to an agreement to convert the Skyline Note to equity, and Zarifi disputed the existence of any such agreement.

When some of Cinco's members could not contribute their share of a $500,000 payment coming due on the Bank Loan, Sheafe negotiated an agreement with the Bank under which he would fully pay his 1/5 share of the Bank Loan ($1.67 million), and the Bank would defer the next payment for one year. Sheafe loaned $1.67 million to Cinco make this payment ("Sheafe Loan").

A memorandum dated October 24, 2006, from Sheafe to the other Cinco members, explained that the Sheafe Loan and the Skyline Loan would be obligations ahead of any members' distribution rights and noted that the Sheafe Note, like the Skyline Note, would be converted to equity when the final plat was recorded. The Sheafe Note provided for interest at 12% and had a maturity date of December 1, 2015.

Sheafe further explained in the October 24 memorandum that an amendment to the Operating Agreement ("First Amendment") was necessary to memorialize the Sheafe Loan. A memorandum dated November 30, 2006, from Sheafe to the other Cinco members included a draft copy of the First Amendment to be signed by all members. The First Amendment provided: (1) for Cinco's procurement of the Sheafe Loan for $1.67 million; (2) for repayment of the Sheafe Loan in the same proportion and at the same time as

4

the Skyline Loan; (3) if Cinco was ever liable to pay any imputed interest to Sheafe in connection with the Sheafe Loan or to Zarifi in connection with the Skyline Loan, such imputed interest would be paid by Sheafe or Zarifi, respectively; and (4) it controlled to the extent there were any inconsistencies between it and the Operating Agreement. Zarifi, whose signature appears on the First Amendment, did not deny signing "some" document, but he asserted that he did not sign the version of the First Amendment presented at trial.

By 2011, Zarifi and Sheafe were the only Cinco members left, with Zarifi holding a 43.53% interest in Cinco, and Sheafe holding a 56.47% interest. To keep things afloat during the downturn in the market, Zarifi and Sheafe contributed funds necessary for improvements to the Cinco Property and for paying operating expenses.

By June 2014, Cinco had not made any payments on the Skyline Loan (or the Sheafe Loan). On June 23, 2014, Cinco and Debtor executed the Skyline Note Amendment, which extended the maturity date to June 30, 2016. The Skyline Note Amendment acknowledged that there was a dispute between the parties as to whether any interest was owing, or had ever been owed, on the Skyline Note. The Bank Loan was paid in full in 2016, which put the Skyline DOT in first position on the Cinco Property. Cinco failed to pay the Skyline Loan on the new maturity date. In fact, Cinco did not make any payments on the Skyline Loan until after Debtor filed for bankruptcy.

## B.    Debtor's bankruptcy filing and the disputed claims

Debtor filed its chapter 11 bankruptcy case on March 1, 2018. As of the

5

petition date, Debtor's assets consisted mostly of real property, litigation claims, and the Skyline Note. Debtor valued its assets at over $12 million.

The secured claims in this case are not at issue. Debtor did, however, challenge all but one of the non-insider general unsecured claims ("Disputed Unsecured Claims"). The Cinco claim is the only one of these claims that requires any substantive discussion.

Debtor, Cinco, Zarifi, Sheafe, and their affiliates have been in litigation for years. Prior to plan confirmation, there remained unresolved disputes regarding the amount Cinco owed on the Skyline Note, including whether interest was owing and in what amount, Sheafe's claims for pro-rata payment of the Sheafe Note with the Skyline Note, and Cinco's claim for damages caused by Debtor's or Zarifi's alleged dumping of trash and construction debris on the Cinco Property. Cinco filed a general unsecured proof of claim in an unknown amount.

The primary dispute is whether the Skyline Note bore interest and, if so, in what amount. Sheafe and Carlier testified that it was their understanding that no interest would accrue on either the Skyline Note or the Sheafe Note because they were to be converted to equity upon the platting of the Cinco Property. Debtor maintained that the Skyline Note did bear interest pursuant to the Skyline Loan documents, which were never modified by a signed writing. Debtor maintained that the balance due on the Skyline Note was $8,431,137.17. This included $4,000,000 in unpaid principal, $1,787,803.84 in unpaid non-default interest, and $2,643,333.33 in unpaid default rate interest.

6

Debtor argued that any extrinsic evidence offered by Cinco to establish that the Skyline Note did not accrue interest was barred by the parol evidence rule, statute of frauds, and other related doctrines. Cinco countered that the parties' conduct was admissible to prove that they agreed no interest would accrue on the Skyline Note and that the Skyline Note was to be converted into equity, citing theories of oral modification, part performance, reformation, and estoppel. Notwithstanding the parties' positions, it was undisputed with respect to the Skyline Note that: no monthly interest payments were made; no statements were issued; Cinco had no record of interest liability in its books or tax returns; Zarifi never mentioned the lack of interest in Cinco's books to Cinco's accountant when they reviewed records; Debtor made no demands for payment until after the Bank Loan was paid in 2016; and Debtor never issued any written default notices to Cinco to trigger the default rate interest.

## C.   The original plans

After the bankruptcy court terminated Debtor's exclusivity period under § 1121 for cause, Debtor and Cinco proposed various chapter 11 plans. The first round of relevant plans was Debtor's plan dated June 4, 2019 ("Debtor's Plan") and Cinco's plan dated September 18, 2018, as modified March 2, 2020 ("Cinco's Plan"). Debtor's Plan and Cinco's Plan (and the amended versions of both) were full payment plans. The main difference was how they treated the Disputed Unsecured Claims. Debtor proposed resolving them through litigation; Cinco proposed settling them, including its own claim, which Debtor vehemently opposed.

7

## 1. Debtor's Plan and the objections

In Debtor's Plan, Zarifi would continue as manager of Debtor. Debtor's accountant, Christopher Linscott, would serve as the Disbursing Agent. The Disputed Unsecured Claims would be paid, to the extent allowed, over three years, with interest, with payments to start on the earlier of payment in full of all claims of higher priority or one year after the effective date. Debtor would deposit funds into a reserve account to pay those claims that were ultimately allowed.

Cinco (and others) objected to Debtor's Plan, arguing that Zarifi's continued management would not be in the best interest of creditors or public policy in violation of § 1129(a)(5). The objectors argued that Zarifi ignored the law, as demonstrated by his not paying judgments and sanctions, committing assault, and engaging in illegal contracting; he ignored the Code and Rules during the course of the bankruptcy case; he breached promises and did not keep his word; he took actions that furthered irrational grievances; he made false, unsupported payment demands; and he did not testify honestly before the bankruptcy court.

The objectors also argued that Debtor's Plan unfairly discriminated against non-accepting classes (i.e., the Disputed Unsecured Claims) in violation of § 1129(b) by imposing undue risk in terms of payment delays. Given the delay involved with litigation, which was entirely under Zarifi's control, the objectors argued it was possible that insider claims would be paid prior to the Disputed Unsecured Claims.

## 2. Cinco's Plan and the objections

As noted above, Cinco intended to settle the Disputed Unsecured Claims. Cinco's Plan disclosed the details of the settlements reached with each of the claimants. For the Cinco claim, Cinco proposed to settle its and Debtor's disputes as follows: (1) Cinco would pay Debtor the unpaid principal balance of the Skyline Note (no interest) of $2,793,959 in full satisfaction of the Skyline Note; (2) Debtor and Zarifi would have to remove the trash they dumped on the Cinco Property; and (3) Cinco would waive its claims for attorney's fees and damages caused by the dumping. Linscott, Debtor's proposed Disbursing Agent, would serve as the Disbursing Agent for Cinco.

Debtor (and others) objected to Cinco's Plan, arguing that it failed to comply with § 1129(a)(1) and (2), was not proposed in good faith in violation of § 1129(a)(3), did not satisfy the best interests of creditors test in § 1129(a)(7), was not feasible as required by § 1129(a)(11), and was not fair and equitable and was discriminatory in violation of § 1129(b).

The principal objection was that Cinco's Plan was based on "forced settlements" of the Disputed Unsecured Claims, particularly Cinco's claim. The objectors argued that Cinco could not unilaterally settle the Disputed Unsecured Claims without Debtor's consent, and even if it could, the proposed settlements were not fair or reasonable in violation § 1129(a)(1) and (2). The objectors also argued that Cinco's Plan was not proposed in good faith but rather was an obvious attempt to advance the interests of Sheafe, the majority member of Cinco, who stood to gain by substantially reducing the

9

amount Cinco owed to Debtor.

The objectors further argued that Cinco's Plan impaired Zarifi's equity interest, because it proposed to strip him of any right to determine whether and on what terms Debtor would settle its claims. Moreover, Zarifi would receive substantially less under Cinco's Plan than he would under a hypothetical chapter 7 liquidation, because there was no evidence that a chapter 7 trustee would agree to such an extremely discounted payoff of the Skyline Note or to any of the other proposed, unreasonable settlements. The objectors also argued that Cinco's Plan was not feasible because Cinco had not demonstrated that it had the funds available to implement Cinco's Plan. Finally, the objectors argued that Cinco's proposed treatment of Zarifi's impaired equity interest was not fair or equitable.

### 3.     Ruling on Debtor's Plan and Cinco's Plan

After a five-day trial and testimony from multiple witnesses, the bankruptcy court entered its 70-page Ruling and Order Regarding Plan Confirmation denying confirmation of both plans (the "Ruling and Order"). Many of the court's decisions in the Ruling and Order are at issue on appeal.[2]

The court denied confirmation of Debtor's Plan for the reasons raised in the objections. It found that Zarifi's continued management of Debtor was not

---

[2] The Ruling and Order denying confirmation of both plans was not a final appealable order until the bankruptcy court entered its later and final order confirming Cinco's Amended Plan. *Bullard v. Blue Hills Bank*, 575 U.S. 496, 498-99 (2015) (bankruptcy court's order denying confirmation of a proposed repayment plan is not a final order); *Giesbrecht v. Fitzgerald (In re Giesbrecht)*, 429 B.R. 682, 688 (9th Cir. BAP 2010) (interlocutory order denying plan confirmation merged into court's final confirmation order, thereby

in the best interest of creditors or public policy in violation of § 1129(a)(5). It also found that Debtor's Plan unfairly discriminated against the Disputed Unsecured Claims in violation of § 1129(b) because Debtor was not obligated to fund the claims reserve account.

The court overruled nearly all of the objections to Cinco's Plan, including the objection that only Debtor could propose settlements of its claims. The court concluded that Cinco could propose such settlements as a plan proponent under § 1123(b)(3)(A). After a painstaking analysis of each proposed settlement of the Disputed Unsecured Claims under *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377 (9th Cir. 1986), the court found that they were fair and equitable, with the exception of Cinco's. The Cinco settlement did not account for the possibility that Debtor could prevail in part, and it was not clear if Sheafe had agreed to waive his right, if any, to interest under the Sheafe Note or his right to pro-rata payment. As a result, Cinco had to modify the Cinco settlement to clarify the Sheafe issues, and to provide Debtor with full recovery of principal on the Skyline Note and of Zarifi's capital contribution, plus additional consideration, before Sheafe could recover any payment on the Sheafe Note or any payment of his additional contributions to Cinco.

## D.    The amended plans

The parties then filed their amended plans – Debtor's plan dated July 10,

---

supporting appellate jurisdiction of the earlier interlocutory order).

2020 ("Debtor's Amended Plan"), and Cinco's plan dated September 18, 2018, as modified July 24, 2020 ("Cinco's Amended Plan").

### 1. Debtor's Amended Plan and the objections

To address the court's concerns about Zarifi's management of and control over Debtor, Debtor's Amended Plan proposed installing Linscott as manager, giving him full managerial authority over Debtor, including exclusive control over Debtor's funds, the power to set litigation and operating budgets, and the authority to negotiate the Disputed Unsecured Claims. As for the court's concerns under § 1129(b), Debtor's Amended Plan provided that insiders would not receive any payments until all of the Disputed Unsecured Claims were either paid in full or disallowed.

In opposition, Cinco argued that Debtor's Amended Plan still failed to satisfy § 1129(a)(5), because it gave Linscott only nominal control over litigation, especially with respect to Cinco, and material decisions still required Zarifi's consent or court approval. Further, argued Cinco, Linscott's term was ambiguous, and it was possible that Zarifi could regain control of Debtor prior to resolution of the disputes between Debtor and Cinco.

### 2. Cinco's Amended Plan and the objections

To rectify the court's concerns about the Cinco settlement, Cinco's Amended Plan proposed that: (1) Cinco would pay Debtor the full amount of principal due on the Skyline Note (no interest); (2) Zarifi would receive his initial Cinco capital contribution of $250,000, and Sheafe would subordinate payment on the Sheafe Note to Zarifi's payment, without interest; (3) Cinco

12

would pay the real estate taxes owed on the Cinco Property; (4) Sheafe would waive his right under the First Amendment to pro-rata payment on the Sheafe Note and waive his right to interest on the Sheafe Note; and (5) Cinco would fund and complete a $60,000 improvement on the Cinco Property which would result in significant sales benefitting Cinco, and by implication Zarifi. Cinco argued that this amendment rendered the Cinco settlement fair and equitable, and therefore it satisfied § 1129(a)(1).

In opposition, Debtor argued that the Cinco settlement was still not fair and equitable. It did not provide one more dollar to Debtor or any other additional consideration from Cinco to Debtor or from Cinco to Zarifi that Cinco was not already obligated to pay.

### 3. Ruling on Debtor's Amended Plan and Cinco's Amended Plan

The bankruptcy court entered a Memorandum Decision and Confirmation Order denying confirmation of Debtor's Amended Plan and confirming Cinco's Amended Plan. In denying confirmation of Debtor's Amended Plan, the court found that it still failed to comply with § 1129(a)(5) given Zarifi's continuing control over the Disputed Unsecured Claims. Specifically, the court was concerned about settlement of these claims. Without Zarifi's consent, Linscott would have to seek court approval for such settlements, which Zarifi would likely object to, resulting in unnecessary delay and expense. Even though Debtor had subsequently settled some of these claims, some remained unresolved.

Further, the court found that the control Debtor's Amended Plan

13

purported to give Linscott with respect to Cinco's claim was illusory. Linscott was authorized to settle for no less than $5.5 million without Zarifi's consent. However, that minimum settlement amount was greater than the maximum amount Debtor could collect on the Skyline Note based on Debtor's expert's valuation of the Cinco Property at $5 million. In addition, nothing in Debtor's Amended Plan prohibited Zarifi from unreasonably withholding his consent to a settlement of Cinco's claim, nor did it allow Linscott to bring any such settlement before the court for approval. Because Debtor's Amended Plan failed to comply with § 1129(a)(5), the court did not determine whether Debtor had addressed the § 1129(b) issues raised in the Ruling and Order.

In contrast, the court found that Cinco's Amended Plan rectified the prior deficiencies in the proposed settlement of Cinco's claim. Rejecting arguments to the contrary, the court found that the amendments to the Cinco settlement rendered it fair, equitable and reasonable. Thus, Cinco's Amended Plan complied with § 1129(a)(1). This timely appeal followed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(L). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1.     Did the bankruptcy court abuse its discretion in confirming Cinco's Amended Plan?

2.     Did the bankruptcy court abuse its discretion in denying confirmation of Debtor's Amended Plan?

14

## STANDARDS OF REVIEW

We review the bankruptcy court's decision to confirm a chapter 11 plan for an abuse of discretion. *Marshall v. Marshall (In re Marshall)*, 721 F.3d 1032, 1045 (9th Cir. 2013). A bankruptcy court abuses its discretion if it applies the wrong legal standard, misapplies the correct legal standard, or makes factual findings that are illogical, implausible, or without support in the record. *United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc).

Factual findings regarding whether a plan meets the requirements for confirmation under § 1129 are reviewed for clear error. *See Computer Task Grp., Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 184 (9th Cir. BAP 2003). Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010).

## DISCUSSION

The requirements for confirming a chapter 11 plan are set forth in § 1129(a)(1)-(16). If all the provisions of § 1129(a) are satisfied with the exception of § 1129(a)(8),[3] a plan can nevertheless be confirmed if it satisfies § 1129(b). The plan proponent bears the burden of establishing that its plan satisfies the confirmation requirements by a preponderance of the evidence. *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653 (9th Cir. 1997).

---

[3] No one disputes the bankruptcy court's finding that neither plan satisfied § 1129(a)(8).

**A.    The bankruptcy court did not abuse its discretion in confirming Cinco's Amended Plan.**

Debtor argues that the bankruptcy court's confirmation of Cinco's Amended Plan was the result of numerous legal errors which require reversal. We address Debtor's arguments in turn.

**1.    The bankruptcy court did not err in finding that Cinco's Amended Plan complied with § 1129(a)(1).**

Debtor first takes issue with the bankruptcy court's decision that Cinco could settle the Disputed Unsecured Claims without its consent. Debtor argues that § 1123(b)(3)(A) cannot be read to permit a settlement over the debtor's objection because a settlement that is the product of one party releasing itself from liability rather than a genuine arms-length negotiation is no "settlement" at all. While this argument has some surface appeal, we disagree, as have other courts.

Under § 1123(b)(3)(A), a plan may provide for the settlement or adjustment of any claim belonging to the debtor or to the estate. Put simply, "the Code expressly provides that a plan proponent may propose a settlement of any claim held by the estate." *In re Cellular Info. Sys.*, 171 B.R. 926, 947 (Bankr. S.D.N.Y. 1994); *e.g., In re BBL Grp., Inc.*, 205 B.R. 625, 633 (Bankr. N.D. Ala. 1996) (holding same and citing cases).

The bankruptcy court in *Cellular Information Systems* addressed this precise issue. There, debtor had sued the creditor lender. The creditor's competing plan proposed to settle the suit at a significant discount. Debtor argued that what the creditor proposed was not a "settlement" because the

16

creditor was seeking to agree with itself as to the amount of its liability. While recognizing that the proposed settlement was not the product of arms-length negotiations between the parties, the court held that it could consider the creditor's proposed settlement under § 1123(b)(3)(A), using the same factors set forth by the Supreme Court in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968). *In re Cellular Info. Sys.*, 171 B.R. at 947-48.[4] *Accord In re Grivas*, 105 B.R. 954, 956-57 (Bankr. S.D. Cal. 1989) (rejecting debtor's argument that plan proponent's "compulsory" settlement of debtor's claim was not a true settlement because the term "settlement" implied a consensual termination of the controversy, and holding that § 1123(b)(3)(A) authorizes the court to consider and, if appropriate, approve a plan proposing a settlement over a debtor's objection); *see also In re Andreuccetti*, 975 F.2d 413, 421 (7th Cir. 1992) (approving creditors' proposed plan which included settlement of debtor's state law claims against the creditors where bankruptcy court applied similar *A & C Properties* standard used in Rule 9019 settlements); *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142 (5th Cir. 1988) (court approved plan proposed by lawsuit defendant and committee of unsecured creditors which provided for settlement of the suit in exchange for, among other things, expungement of defendant's $7 million claim against debtor).

Debtor relies on *In re Bigler LP*, 442 B.R. 537, 543-44 (Bankr. S.D. Tex. 2010), for the proposition that § 1123(b)(3)(A) does not authorize the court to

---

[4] These are essentially the same factors found in *A & C Properties*, 784 F.2d at 1381.

17

approve a settlement without the debtor's consent. However, that case does not conclude that a creditor plan may not provide for settlement of a claim against the creditor. *Bigler* involved a nonconsensual, third-party release, not a settlement of the debtor's claims against the plan proponent where the parties had an opportunity to litigate the issues.

Debtor argues that allowing the creditor to settle a claim against itself deprives the debtor of its right to its day in court to litigate the claim. But Debtor had its day in court. It had the exclusive right to file and confirm a plan prior to the exclusivity period expiring under § 1121(b). It did not do so. At that point, Cinco was able try its hand at accomplishing this task. § 1121(c). Read together, § 1121(c) and § 1123(b)(3)(A) authorized Cinco to file a confirmable plan and to propose a settlement in that plan.

Although Debtor argues that it should have had exclusive control over its claims against Cinco (and the other Disputed Unsecured Claims) and that it was deprived of due process with Cinco's unilateral settlement(s), Congress's intent in § 1123(b)(3)(A) is clear: the debtor or the trustee do not have sole authority to propose settlements in a plan. But the creditor's ability is not unfettered. The proposed settlement must still pass muster for fairness under *A & C Properties*. Debtor's concern that Cinco was not acting to maximize the value of the estate by settling claims for less than their worth, especially the Cinco claim, is overstated. The court still has a duty to evaluate the merits of a claim and determine whether the proposed settlement falls within the range of reasonableness. Ultimately, if the court applies the same

18

standard to all proposed settlements under § 1123(b)(3)(A), then it should not matter which party proposes the settlement.

Debtor then argues that even if unilateral settlements are permissible under § 1123(b)(3)(A), they must be subject to stricter scrutiny. Debtor argues that the bankruptcy court abused its discretion by applying the *A & C Properties* factors, without more, to conclude that the Cinco settlement was fair and equitable. We are not so convinced and believe that the *A & C Properties* factors provide a proper standard for reviewing proposed settlements in a plan under § 1123(b)(3)(A).

In support of its argument, Debtor cites *Whispering Pines Estates, Inc. v. Flash Island, Inc. (In re Whispering Pines Estates, Inc.)*, 370 B.R. 452 (1st Cir. BAP 2007). There, the creditor plan proponent proposed a release of any and all claims (both current and future) held by the debtor, trustee and the estate against the creditor. *Id.* at 456. The estate had two causes of action against the creditor of uncertain merit and value. *Id.* at 454. Debtor objected to the release provision. The First Circuit Bankruptcy Appellate Panel viewed the release as two distinct releases rolled into one: "'a settlement or adjustment of claims belonging to the debtor and the estate' within the meaning of § 1123(b)(3)(A); and a release (or limitation of liability, or grant of immunity) of a party responsible for implementing the plan." *Id.* at 460. As to the former, the Panel held that a bankruptcy court must not give deference to a settlement that is not put forth by an estate fiduciary who negotiated it in an arms-length transaction but rather unilaterally by the very party who would be receiving

19

the benefit of the release. *Id.* at 461.

First, we distinguish *Whispering Pines* because it involved a release of liability, not a settlement of pending claims between the debtor and the plan proponent. Further, even if applicable, the bankruptcy court here did not afford **any** deference to Cinco in evaluating the proposed settlement. To the contrary, it engaged in an exhaustive analysis of all the relevant factors to conclude that the Cinco settlement was fair and equitable. It even denied confirmation the first time around because it found that the proposed settlement was not fair and equitable. The bankruptcy court in *Whispering Pines* failed to analyze the release at all, under any set of factors, which is not the case here.

Next, Debtor argues that the bankruptcy court exceeded its authority by confirming a plan that required dismissal of a non-core, state law claim. Before the bankruptcy court entered the Confirmation Order, Debtor filed a complaint against Cinco in state court to enforce the Skyline Note. When Cinco removed the case, Debtor moved for remand and gave notice that it did not consent to the bankruptcy court's entry of final judgment. In light of its non-consent, Debtor argues that the bankruptcy court lacked authority to enter any final order resolving the suit, including the Confirmation Order, citing *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665 (2015).

Debtor's argument lacks merit. The Skyline Note and Debtor's claims against Cinco arising from it and the related loan documents are assets of the estate. Plan confirmation is a "core" proceeding over which the bankruptcy

court has exclusive jurisdiction. 28 U.S.C. § 157(b)(2)(L). As part of its plan, Cinco could settle Debtor's loan-related claims against it under § 1123(a)(3)(B), which is what occurred here, despite Debtor's argument that it was a compelled "dismissal" of its pending state law claims without its consent. Moreover, Cinco's settlement also resolved Debtor's objection to Cinco's proof of claim, which directly concerned the administration of the estate, both "core" proceedings under 28 U.S.C. § 157(b)(2)(A) & (B). Accordingly, the bankruptcy court had jurisdiction to enter the Confirmation Order, which effectively and finally resolved the suit.

Debtor next argues, even if we conclude that *A & C Properties* is the proper standard to apply in evaluating the Cinco settlement, the bankruptcy court's approval of it as a fair and equitable compromise should be reversed for two reasons: it was the product of the court's erroneous interpretation and application of Arizona law; and Cinco's settlement was no settlement at all, as it gave Cinco the maximum relief it could possibly achieve.

The bankruptcy court carefully reviewed the proposed Cinco settlement (and all of the proposed settlements) under *A & C Properties* to determine whether it was fair and equitable. The four relevant factors in assessing fairness and equity under *A & C Properties* are: (a) probability of success in the litigation; (b) difficulties, if any, to be encountered in the matter of collection; (c) complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) paramount interest of the creditors and a proper deference to their reasonable views. *In re A & C Props.*, 784 F.2d at

21

1381.

No one factor is dispositive; "the factors should be considered as a whole to determine whether the settlement compares favorably with the expected rewards of litigation. " *Greif & Co. v. Shapiro (In re W. Funding Inc.)*, 550 B.R. 841, 851 (9th Cir. BAP 2016), *aff'd*, 705 F. App'x 600 (9th Cir. 2017). Because a court has discretion as to how much weight to give to each of the factors, "any one factor may have weight in isolation that justifies the settlement." *Tieni v. Mastan (In re Bondanelli)*, BAP No. CC-19-1175-TaFS, 2020 WL 1304140, at *2 (9th Cir. BAP Mar. 18, 2020).

"The law favors compromise and not litigation for its own sake[.]" *In re A & C Props.*, 784 F.2d at 1381. "[W]hen assessing a compromise, courts . . . canvass the issues and need not rule on disputed facts and questions of law." *In re Bondanelli*, 2020 WL 1304140, at *2. "If the court were required to do more, there would be no point in compromising; the parties might as well try the case." *Id.*

The primary dispute between the parties is whether the Skyline Note accrued interest. Debtor said it did; Cinco said it didn't. In its 16-page analysis of the first *A & C Properties* factor – probability of success in litigation – the bankruptcy court considered Debtor's argument that extrinsic evidence offered by Cinco to establish that the Skyline Note did not accrue interest was barred by the parol evidence rule and the statute of frauds. The court also considered Cinco's arguments that, despite the express terms of the Skyline Note, a court could consider the parties' conduct – i.e., the failure to pay

22

interest, and the failure to bill for, demand, or even account for interest – as proof that they agreed no interest would accrue on the Skyline Note, under the theories of oral modification, part performance, reformation, and estoppel. Ultimately, the bankruptcy court concluded that a court receiving the evidence could find that the doctrine of part performance and/or equitable estoppel applied to overcome the application of the statute of frauds, or that the parties orally modified the Skyline Note, or that the evidence might support a reformation claim, which is not subject to the parol evidence rule.

Debtor argues that the bankruptcy court made legal errors to reach its conclusion that Cinco could potentially succeed on its asserted theories of oral modification, part performance, reformation, or estoppel to overcome the express terms of the Skyline Note that interest accrued. However, we see no error by the court in its lengthy and well-reasoned analysis of Arizona law and the highly complex facts of this case. Further, in the settlement context, the court was required to only canvass the issues, not conduct a "mini-trial" on the merits of each disputed legal question. *In re W. Funding Inc.*, 705 F. App'x at 601.

Even if Debtor were correct that the court erred in analyzing the legal theories and defenses raised by Cinco, the probability of success in litigation was only one of the factors it had to consider. If any of the other three *A & C Properties* factors weighed in favor of settlement, any error by the bankruptcy court as to the first factor would not constitute reversible error. The third and fourth *A & C Properties* factors clearly weighed in favor of settlement. The cost

23

and delay of litigating these complex issues between the parties would be substantial. It already has been. And litigating these issues to no reasonable end is certainly not in the best interest of creditors or the estate.

Debtor maintains that the bankruptcy court was correct in initially holding that the amount Cinco proposed to pay Debtor in Cinco's Plan was insufficient, thereby precluding a finding that the Cinco settlement was fair and equitable. However, Debtor argues that the court erred in holding that Cinco's Amended Plan cured this defect, as it provided zero additional consideration from Cinco to Debtor. Debtor complains that the only amendments Cinco made to its settlement proposal were to require Cinco to make payments it was already obligated to pay, or which were entirely worthless to Debtor.

The bankruptcy court considered these same arguments and rejected them. Cinco's Amended Plan provided: (1) for Sheafe's waiver of rights to interest on the Sheafe Note and the subordination of any Sheafe Note payments to the extent of Zarifi's $250,000 initial capital contribution; (2) that Cinco would bring current the property taxes on the Cinco Property; and (3) that Cinco would fund and complete improvements to the Cinco Property to boost lot sales. Over Debtor's objection, the court found that these items were sufficient additional consideration to make the Cinco settlement fair and equitable, because even to the extent they did not directly benefit Debtor, they clearly benefitted Zarifi, the sole member of Debtor and a member of Cinco.

We see no error in the court's finding that the additional consideration offered in Cinco's Amended Plan rendered the Cinco settlement fair and equitable.[5]

Debtor also makes similar arguments with respect to Cinco's proposed settlements of two of the Disputed Unsecured Claims – the RL Ventures claim and the Stachowski/Stromberg claim. Debtor argues that, even if the settlements were permissible, they were not fair or reasonable. Again, Debtor wishes to litigate the merits, or lack thereof, of these individual claims and focuses only on the first *A & C Properties* factor. However, after careful review of all four factors as to each proposed settlement, the bankruptcy court found that all four weighed in favor of settlement of the RL Ventures claim, and that all four factors were either neutral or weighed in favor of settlement of the Stachowski/Stromberg claim. More importantly, the court found that both settlements were fair and equitable, and Debtor fails to articulate how the court's findings with respect to these settlements were clearly erroneous.

Further, Debtor loses some credibility in trying to argue that the RL Ventures claim was meritless, when Debtor later settled that claim in a last-ditch effort to get its amended plan confirmed. And Debtor's argument that the bankruptcy court erred in granting Stachowski and Stromberg leave to file an untimely claim without conducting an evidentiary hearing to determine if they had knowledge of Debtor's bankruptcy before the claims bar date expired is not well-taken. The case cited by Debtor, *Zidell, Inc. v. Forsch (In re*

---

[5] Debtor's argument that Cinco had to pay Zarifi the entire $1.9 million he contributed to Cinco and not just his initial $250,000 contribution is wrong. As the

25

*Coastal Alaska Lines, Inc.)*, 920 F.2d 1428 (9th Cir. 1990), did not hold that an evidentiary hearing is required to determine a claimant's knowledge of the bankruptcy or claims bar date. Further, it was undisputed that Debtor did not list Stachowski and Stromberg as creditors in its schedules, and testimony established that they did not learn of Debtor's bankruptcy case until July 2019, nearly 10 months after the claims bar date.

2. **The bankruptcy court did not err in finding that Cinco's Plan complied with § 1129(a)(7).**

Debtor argues there was no evidence that Zarifi, Debtor's only equity holder, would receive as much money on account of his equity interest in Debtor under Cinco's Plan as he would in a hypothetical chapter 7. Put simply, Debtor argues that Cinco's Plan failed the best interests test as to Zarifi's equity interest. We disagree.

Section 1129(a)(7) requires that a plan provide each holder of an impaired class of claims or interests at least the liquidation value of the claim or interest unless the holder accepts the plan. § 1129(a)(7)(A). To determine whether a plan satisfies § 1129(a)(7), a court must determine what creditors and interest holders would receive under a hypothetical chapter 7 liquidation, and compare that hypothetical liquidation return with what creditors and interest holders would receive under the proposed plan. *Schoenmann v. Bank of the W. (In re Tenderloin Health)*, 849 F.3d 1231, 1237 (9th Cir. 2017). An unimpaired class is deemed to have accepted the plan and thus satisfies

bankruptcy court noted, it only required Cinco to pay Zarifi his initial $250,000 contribution, nothing more.

§ 1129(a)(7). § 1126(f).

Even if Zarifi's equity interest was impaired, an argument which Debtor dubiously raised on Zarifi's behalf before the bankruptcy court, the court found that he would receive under Cinco's Plan at least as much as he would in a chapter 7 liquidation. This was based on a liquidation value of no more than $5 million for the Skyline Note (i.e., Debtor's appraised value of the Cinco Property), which would be reduced by substantial chapter 7 trustee fees and administrative expenses. Although Debtor complains that there was "no evidence" to show what these fees and expenses would be or that they could be substantial, the court could speculate that they could be substantial. *See In re Sierra-Cal*, 210 B.R. 168, 172 (Bankr. E.D. Cal. 1997). Given Zarifi's litigious nature, it would not be an irrational assumption that the administrative expenses in a chapter 7 case would be high. One also has to consider that the First Amendment provided that the Sheafe Note was entitled to parity with the Skyline Note in payment and term, which would also reduce the value of Zarifi's interest. On this record, we see no clear error in the court's finding that § 1129(a)(7) was satisfied in this case.

**3.    The bankruptcy court did not err in finding that Cinco's Plan complied with § 1129(a)(3).**

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." A court need only look "to the proposal of a plan, not the terms of the plan." *Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031, 1035 (9th Cir. 2019). "A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code."

*Platinum Cap., Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002).

Debtor argued before the bankruptcy court, and argues before us, that Cinco's Plan was proposed in bad faith because Cinco – i.e., Sheafe – had an ulterior motive to obtain its own release for as little money as possible. Debtor argues that this is inconsistent with the objectives and purposes of the Code. The bankruptcy court rejected Debtor's argument, ruling that it was not required to evaluate the "terms" of Cinco's Plan for purposes of § 1129(a)(3), and there was no evidence that Cinco had proposed its plan in bad faith. But even when the court looked to the terms of Cinco's Plan, it was still not persuaded by Debtor's argument.

Debtor argues that the bankruptcy court's holding that Cinco acted in good faith because it proposed a "full-payment plan" was both legally erroneous and factually inaccurate. Debtor argues that Cinco's ability to propose full payment to creditors flowed only from Debtor's solvency, which had nothing to do with Cinco. And with or without the "settlement" payment from Cinco, Debtor argues that it had sufficient assets to pay its creditors in full. Debtor argues that Cinco's proposal to pay creditors with Debtor's own money did not negate the fact that Cinco's Plan served an improper ulterior motive of escaping millions of dollars in liability to Debtor.

While Debtor focuses on the bankruptcy court's statement that Cinco's Plan was a full-payment plan, that was not the extent of the court's findings. It also found that Debtor would still retain millions of dollars in unencumbered

28

cash and property, that Zarifi would retain his 100% ownership interest in Debtor and remain its manager, and that Zarifi would retain his ownership interest in Cinco. The court was also not convinced by Debtor's argument that paying Debtor less on the Skyline Note would benefit Sheafe by being able to distribute more to himself from Cinco. Zarifi is likewise a member of Cinco and would be entitled to any distributions made to members. We perceive no clear error in the bankruptcy court's finding that Cinco's Plan was proposed in good faith.

**4.    Debtor's arguments regarding Cinco's nondisclosure of its proposed new loan terms and feasibility evidence fail.**

In what appear to be throwaway arguments, Debtor argues that it did not know enough about Cinco's exit financing terms, alleging that Cinco failed to provide adequate information about the loan's terms or present any evidence as to feasibility such as a term sheet. Debtor argues that this violated the disclosure requirements of § 1125 and the feasibility requirement of § 1129(a)(11). Notwithstanding, Debtor does not articulate how the bankruptcy court erred with respect to these issues. Issues that are raised but not supported by argument are typically deemed abandoned. *Acosta-Huerta v. Estelle*, 7 F.3d 139, 144 (9th Cir. 1992). In any event, any argument as to feasibility appears to be moot given that Cinco received the exit financing.

To the extent Zarifi argues that Cinco failed to sufficiently disclose the terms of the "new, nonconsensual secured loan" which subordinated his interest in Cinco, that is an issue concerning the internal management of Cinco and not one the bankruptcy court needed to (or even could) consider.

**5. The bankruptcy court did not err in finding that Cinco's Plan was fair and equitable under § 1129(b).**

Debtor argues that, because Cinco's Plan was rejected by impaired classes of claims and interests, it could be confirmed only if it satisfied the requirements of § 1129(b), which provides in pertinent part that a plan is fair and equitable if any junior interest holder will not receive or retain any property under the plan on account of such junior interest. § 1129(b)(2)(C)(ii).

Debtor argues that the bankruptcy court erred in finding that Cinco's Plan complied with § 1129(b). Debtor argues that Cinco's proposed treatment of Zarifi's impaired equity interest under Cinco's Plan was not fair or equitable because it stripped him of millions of dollars of equity by involuntarily subjecting Debtor to "windfall settlements" of various claims and defenses whose merit was tenuous, and it proposed to enrich Sheafe at Debtor's and Zarifi's expense.

Noting that Zarifi had not filed an objection to Cinco's Plan, the bankruptcy court rejected these same arguments from Debtor, finding either that Zarifi's equity interest was not impaired under Cinco's Plan and thus § 1129(b) did not apply, or if it was impaired, Cinco's proposed treatment was fair and equitable and satisfied § 1129(b)(2)(C)(ii) given that there were no junior equity interest holders who would receive or retain anything. Debtor has not demonstrated any clear error by the bankruptcy court in finding that Cinco's Plan satisfied § 1129(b).

**B. The bankruptcy court did not abuse its discretion in denying confirmation of Debtor's Amended Plan.**

The bankruptcy court found that Debtor ultimately met the requirements of confirmation other than § 1129(a)(5), finding that Zarifi's control over the post-confirmation debtor was not "consistent with the interests of creditors and equity security holders and with public policy." § 1129(a)(5)(A)(ii). Debtor argues that the bankruptcy court's ruling that Debtor's Amended Plan violated § 1129(a)(5) because Zarifi retained the right to object to settlements proposed by Linscott was wrong. But that was not the court's ruling.

The bankruptcy court ruled that Zarifi's continued control over the settlements was not in the best interest of creditors because he made it clear that he would continue to litigate the Disputed Unsecured Claims no matter the cost, no matter the delay, even if such litigation was not in the financial interest of Debtor or its creditors. And Debtor's Amended Plan vesting post-confirmation management exclusively in Linscott failed to resolve the court's concerns on that issue, because Zarifi's consent or court approval over his objection as sole member of a solvent debtor would be required for all settlements of the Disputed Unsecured Claims.

Debtor argues that Zarifi's retention of some right to object to proposed settlements of the Disputed Unsecured Claims or the Skyline Note would not have any effect on the interests of creditors in receiving payment on their allowed claims. That may not be true. Debtor's unending and costly litigation over the Disputed Unsecured Claims had the potential to dissipate Debtor's

31

assets to the point that those claims could be at risk of not getting paid, if allowed. On this record, the court's finding that Debtor's Amended Plan did not satisfy § 1129(a)(5) was not clearly erroneous.

## CONCLUSION

For the reasons stated above, we AFFIRM the Confirmation Order confirming Cinco's Amended Plan and denying confirmation of Debtor's Amended Plan.